Argued May 8, one case affirmed, one case reversed August 22, 1956

MEISTER ET AL *v.* FINLEY ET AL
IN RE ESTATE OF ALVIN KEENAN, DECEASED
MEISTER ET AL *v.* FINLEY ET AL
300 P. 2d 778

*P. A. Schwabe* argued the cause for respondents. On the brief were Haas & Schwabe, Portland.

*William G. Dick* argued the cause for appellants. On the brief were Dick & Dick, The Dalles.

Before WARNER, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

LUSK, J.

These are appeals by the defendants from adverse decrees in two cases consolidated for trial in the circuit court and this court.

The plaintiffs are the next of kin and heirs at law of Alvin Keenan, who died on March 10, 1954, testate. Arthur Keenan is a brother and the other plaintiffs are heirs of two deceased sisters. The defendants, Virginia E. Finley and Clyde L. Finley, are sole beneficiaries and, respectively, executrix and executor under the last will and testament of Alvin Keenan, deceased, which was executed February 23, 1949. They

are also grantees in a general warranty deed executed and delivered by the deceased on May 29, 1952, and conveying the Southwest Quarter (SW 1/4) of Section Nine (9), Township Two (2) North, Range Sixteen (16) East of the Willamette Meridian in Sherman County, Oregon, subject to a life estate in the grantor. This land was the principal asset owned by Alvin Keenan at the time of his death.

The object of the one suit is to have the will declared void and the probate thereof revoked because of alleged incapacity of the testator and undue influence exerted by defendants to procure its execution; of the other, to obtain a decree cancelling the deed for the same reasons.

The court entered decrees invalidating both instruments on the ground of mental incapacity of Alvin Keenan. The decree cancelling the deed granted to the defendants an equitable lien against the real property in the sum of $3672.05, of which $3,000 was the consideration paid by the defendants to the deceased for the conveyance and the remainder was the amount of advances made by the defendants in payment of expenses of the last illness and funeral expenses of the deceased.

In the court below it was conceded by counsel for the plaintiffs that in order to obtain any substantial relief his clients must prevail in both causes, for the reason that if the deed only were set aside the property would revert back to the estate of the deceased, while, if the will were set aside and the deed permitted to stand, there would be little of value left in the estate.

Alvin was one of four children of Bernard and Lydia E. Keenan, both of whom died in 1924. In her last will and testament Lydia E. Keenan recited that she had attempted to deed the land in Sherman County,

above described, to her son Alvin, and then devised the land to him in the event that such conveyance should prove to be defective. In fact, both the deed and the will were ineffectual for the intended purpose because the title to the land stood in the name of Bernard Keenan. Bernard died a few months after his wife. He left no will, and the estate was probated in Umatilla County. Arthur Keenan, who, as stated, is a brother of Alvin and one of the plaintiffs, petitioned the court for the appointment of an administrator of his father's estate, and in his petition averred that the only real property belonging to the deceased was certain described land in Umatilla County. Thus it appears that the Sherman County land was never conveyed or devised, and the four children of Bernard and Lydia E. Keenan inherited it from their father as owners in common. It is shown, however, by a decided preponderance of the evidence that it was the understanding in the family that this land was the property of Alvin. From the time of his father's death until the execution of the deed, which is here challenged, he treated it as his own without objection on the part of his brother and two sisters and with their acquiescence.

The quarter section in dispute is located at the junction of the Columbia River and Sherman County highways near the railroad junction point known as Biggs, about 20 miles east of The Dalles. Alvin's parents were living there at the time of their death, and he continued to live there until he died. His parents had built a frame service station on the land. From May, 1925, until his death Alvin leased the land, reserving to himself all rights therein other than to the service station and the immediate vicinity thereof. He became acquainted with the defendants, Pete and Mattie

Finley, as they are referred to in the testimony, in 1927, and from September, 1929, until his death they were his lessees.

Alvin was a bachelor. After the death of his parents he lived at Biggs, part of the time until 1940 with his sister Grace, and after her death in that year he lived alone in a small house adjoining his property about three-fourths of a mile from the service station.

Alvin died at the age of 76, leaving an estate consisting of personal property appraised at $1643.97, of which $1068.97 was money. On the theory that the land had passed to the defendants by the deed to the Finleys executed in 1952, it was not included in the inventory of the estate.

The Finleys acquired land adjoining Alvin's on the north and built on it and operated a restaurant, motel and truck service station. They made extensive improvements on the service station which they rented from Alvin. As the years went by an intimate friendship developed between the Finleys and Alvin, and it is apparent that this relationship was much closer than that between Alvin and his relatives, whom he rarely saw. In his childhood Alvin had an illness diagnosed as "brain fever," which retarded his mental development. He spent nine years in the first grade, and never learned to read or write, but was taught by his mother to sign his name. He knew, however, the property that he owned and its location. He kept up the fences on the land and attended to the small matters of business which he had. He collected his rentals and moneys coming to him for water piped from springs on his land and distributed to the inhabitants of Biggs and to the railroad. He rented for pasture the portion of land not included in the service station lease. He paid regularly the premiums on a life insurance policy. He resisted

attempts of his brother Arthur to have him increase the rental paid by the Finleys. He never had regular employment but from time to time worked as a farmhand. He bought his food and clothing, prepared his own meals, and was neat and orderly both in his home and in his personal appearance.

In 1948 Arthur commenced a proceeding to have a guardian appointed for Alvin. Alvin thereupon employed an attorney, the late Frank Dick, of The Dalles, who prepared an answer for him, and the suit was dismissed on Arthur's motion.

On February 23, 1949, at Alvin's request the Finleys accompanied him to the office of Mr. Dick to have his will drawn. After devising all his property to the Finleys the will provides in part:

"SECOND: I further state that I have never been married and that I have no child nor children. I further state that I am not giving any part of my property to relatives, as they have enough to care for themselves, and for the further reason that my friends, to whom I am giving my property, have been my friends for years, cared for me when I was sick, helped me with my problems in every way, and have been as good to me as if they were my own children, as was recently demonstrated when I was very ill; and, at the same time, my blood relatives did not assist me in any way, and in addition to that I feel my brother has dealt unfairly with me in business matters.

*    *    *    *    *

"FOURTH: This will is based upon a part consideration, and is irrevokable [sic], which consideration is that there is an agreement between the said devisees and legatees to protect me in sickness and to take care of me when I need care, and to pay the expenses of my sickness and funeral if my own funds are insufficient to pay the same; but, at any

rate, that they will protect me in sickness and give me a respectable funeral at death, and if one should predecease me that the other shall do so."

After the will was drawn and before its execution Mr. Dick called the Finleys into his private office and read it aloud, informing them that, as the will imposed certain obligations on them, they should be advised of its contents. There is some uncertainty in the testimony as to whether the Finleys were in the private office of Mr. Dick before this when Alvin was informing the latter of the disposition that he wished to make of his property.

In 1949 the State Highway Commission was desirous of acquiring for highway purposes a small triangular piece of Alvin's land. In order to clear the title Alvin, through his attorney, William Dick, son of the Frank Dick previously mentioned and who was then deceased, obtained quitclaim deeds to the entire tract from all the heirs of Alvin's mother and father except Arthur, who refused to execute a deed. It thereupon became necessary for Alvin to file a suit to quiet title. The case came on for trial on April 29, 1952, but after one day of taking of testimony was terminated by an agreement of settlement under which Alvin paid Arthur $3,000 for a deed to Arthur's interest in the land in dispute. Alvin did not have $3,000, and the money was advanced by the Finleys, and Alvin, in consideration thereof, deeded the land to them, reserving a life estate. This is the deed challenged by the plaintiffs. It was further agreed between Alvin and the Finleys that he would give them a lifetime, nonassignable lease of the land at a monthly rental of $75, reserving to Alvin all water rent and rent for pasture, and that the Finleys would pay all hospital

and doctors' bills incurred by Alvin. This lease was executed, and the terms of the agreement on the Finleys' part faithfully carried out. At this time Alvin was 74 years of age.

In the suit to quiet title Alvin was represented by Roger Dick, a brother of William Dick, who tried the case at bar for the defendants, and Arthur was represented by Sam Van Vactor, an attorney of The Dalles. Roger Dick testified in the present case that when they were getting ready for the trial of the suit to quiet title Alvin told him that he believed his brother had a deed from his mother to him (Alvin) covering the disputed property. This resulted in the production of the deed by Mr. Van Vactor as Arthur's attorney. Mr. Van Vactor, who cross-examined Alvin at length in the trial of the suit to quiet title, testified in the present case that in his opinion Alvin Keenan had sufficient mental capacity to execute either a will or a deed.

The foregoing in broad outline is a recital of what seem to us to be the salient facts of the case. The transcript of testimony is 622 pages in length. We have not thought it necessary to refer in detail to the mass of opinion evidence on both sides given by friends, acquaintances and relatives of Alvin respecting his mental capacity. Much of it is no doubt to be discounted as coming from interested sources. We have referred specifically to Mr. Van Vactor's testimony because it is disinterested and is a lawyer's judgment based on his observation of the behavior of an adverse witness.

The circuit judge carefully analyzed the evidence in a well-prepared opinion. He found that there was a confidential relationship between Alvin and the Finleys, but that the defendants had sustained the burden of proving that the execution of the instruments under attack was not induced by the exercise of undue in-

fluence on their part. On the contrary, he commended the Finleys for their fairness in their dealings with Alvin, their uniform kindness to him, and the strong interest they showed in his welfare, and criticized Arthur as one having ''designs on Alvin's interest in the property.'' He found that Alvin was ''shunned by his nieces and nephews'' and said: ''In view of his relations with his nieces and nephews and his only brother, I feel that the Finleys, the people who had befriended him for twenty years, were more logical objects of his bounty than his next of kin.''

■■ With these conclusions we agree; but we are forced to differ with the learned circuit judge on the question of Alvin's mental capacity, at least as far as his competency to make a will is concerned. We have said that for this purpose ''it is sufficient for the testator to understand the business in which he is engaged, his property, the natural objects of his bounty, and the distribution he desires to make of his property.'' *Miller v. Jeffery,* 129 Or 674, 687, 278 P 946. See to the same effect *In re Estate of Verd Hill,* 198 Or 307, 317-318, 256 P2d 735. There we quoted the following from *In re Estate of Riggs,* 120 Or 38, 48, 241 P 70, 250 P 753:

''No particular degree of acumen will serve as a standard for testamentary capacity. Each case is to be decided upon its own facts and circumstances. The question is, Was the will the free and intelligent product of the testator's mind or not?''

The circuit judge said in his opinion:

''I feel that he knew his property, such as it was, and that he knew the objects of his bounty, and only too well. However, I do not feel that he had sufficient intelligence to comprehend the nature of making a will and recognize the scope and reach of the provisions of the instrument.''

■ That Alvin knew his property and the objects of his bounty the record leaves scarcely open to question. In our opinion the record also clearly discloses he had sufficient mental capacity to know precisely what he was about when he executed the will. He participated as plaintiff and witness in a law suit in which no one questioned his competency. He remembered the circumstance that Arthur had possession of their mother's deed to him and sufficiently comprehended its significance to inform his attorney about it. In the settlement of the suit to quiet title he paid out $3,000 to Arthur and executed a deed and a lease to the Finleys. His competency to perform these acts was not questioned at the time. When his brother attempted to put him under a guardianship he knew enough to resist and consult an attorney. Unless we are to reject the testimony of the Finleys—and we agree with the circuit judge that it should not be rejected—he asked them to go with him to the office of his attorney for the purpose of making a will. The will was read in his presence by his attorney, and he expressed his satisfaction with it. The only surviving witness to the will testified to his mental competency.

■ Alvin Keenan's formal education was nil because as a child he did not have the mental capacity to absorb an education. He was definitely below normal. He was slow in conversation and slow to understand, but he could comprehend simple things once they were explained to him. He had sufficient mental capacity to attend competently to his own small affairs, to look after himself, to hold on to what he owned, and to know whom he could trust. In these respects he seems to have been possessed of a higher degree of intelligence than many well-educated people. A man may have quite limited intelligence and still be competent to select the

persons whom he wishes to receive his worldly goods at his death and to know that an instrument he signs will effectuate his purpose in that regard. Such a man we think was Alvin Keenan.

As to the deed, in view of the stronger "mental powers" (*Miller v. Jeffery,* supra), which the law requires in order to sustain the validity of such an instrument, we hold, though with some hesitancy, that it should be cancelled. Since we are sustaining the will, the provision for a lien in favor of the defendants in the decree cancelling the deed should be eliminated.

The decree setting aside the will is reversed; the decree cancelling the deed is affirmed.