Argued November 20, 1956, affirmed May 15, 1957

PIONEER TRUST COMPANY *v.* CURRIN ET UX

311 P. 2d 445

*Edward L. Clark, Jr.,* argued the cause for appellant. On the brief were Marsh, Marsh & Dashney, Edward L. Clark, Jr., and Malcolm F. Marsh, Salem.

No appearance for respondents.

WARNER, J.

This is a suit by Pioneer Trust Company, as Guardian of the Estate of Joseph W. Vandecoevering, an incompetent person, to set aside a deed to real property by its ward, given to the defendants, H. W. Currin and Laura E. Currin, his wife, as grantees, prior to the institution of the guardianship. The guardian appeals from a decree dismissing its complaint. The prevailing defendants made no appearance in this court.

On May 22, 1953, Joseph W. Vandecoevering, hereinafter referred to as the plaintiff, executed the challenged deed conveying a quarter section of land in Washington County, Oregon, to the defendants Currin for a consideration of $2,000, cash. On September 3, 1953, a little more than three months later, plaintiff was committed to, and received at, the State Hospital, in Salem. There he remained for seven months before he was transferred to the U. S. Veterans Hospital, in Roseburg, Oregon, an institution especially equipped for the care and treatment of mentally-ill ex-servicemen. Since his initial commitment, he had been continuously confined in the state and federal hospitals under the original court order and was a patient in the latter hospital on July 12, 1955, the time of the trial in the case at bar.

It is the position of the appellant, as reflected by both complaint and brief, that the deed in question is void because of Vandecoevering's incompetency at the

time of its execution, or, as appellant puts it in the alternative, "the inadequacy of the consideration paid, the weakness of the ward's mind, and the unequal abilities of the parties to determine the value of the property, indicate fraud over-reaching and inequitable conduct which would call for a court of equity to order that respondents hold the real property in question as constructive trustees for the ward."

Summarizing the evidence, we find that plaintiff, in 1946, shortly after his discharge from the service, bought the subject property for $4,500. It is in a mountainous area of Washington county. Approximately 20 acres are tillable and fairly level. During his ownership, up to 1952 or 1953, plaintiff used from three to thirteen acres of the tillable area for raising strawberries. This he did with varying degrees of success from year to year, but by 1953 the strawberry plants were old and practically of no value.

The remaining 140 acres were in timber when he acquired the place. Three years during the period from 1949 or 1950 to 1952, inclusive, plaintiff sold parcels of his timber to three different logging operators. From them he received amounts aggregating $4,500, which, by coincidence, equals his original investment in 1946. These operations denuded the land of its merchantable timber and left it in condition referred to as "stump range" and too steep to farm.

There is no doubt that plaintiff's mental illness began long before he executed his deed to the Currins. After his return from the war, in 1946, some of his relatives and friends noted some change in manner deviating from his normal mental standards. It is from these persons we learn that plaintiff's mental deterioration was gradual, but after the death of his mother in

January, 1953, it worsened markedly. The manifestations of evident mental trouble took various forms at times such as: staring into space, talking to himself as he looked into the mirror, laughing and giggling and sometimes covering his face with his hands as he did so, and moody spells. A somewhat like performance followed when he was drinking; that is, he would look into the glass of beer and talk to it or himself. He was not responsive when called and walked the floors "all night." The changes in his condition eventually reached a point where a brother and a friend deemed it necessary to have him committed to the State Hospital as they did in September, 1953.

At the hospital plaintiff was received and examined by Dr. John Bower, a psychiatrist, who testified as one of plaintiff's witnesses. Dr. Bower tells us that at that time plaintiff was a "very disturbed person," requiring full restraint. It was there plaintiff's condition was diagnosed as a paranoid form of schizophrenia, an insidious disease that comes over a long period of time.

■ Appellant cites numerous Oregon cases, beginning with *Farley v. Parker*, 6 Or 105 (1877), 25 Am Rep 504, as authority for the proposition that a deed given by a person *non compos mentis* is void. But to rest on that statement, alone, is not enough. The test of the grantor's mentality is made *as of the moment of the execution of the conveyance,* not as his mental condition was before or after the completion of the challenged transaction. In short, the test raises the question of whether or not the grantor executed the contested instrument during a lucid interval. This is evident from a closer reading of the Farley case, supra, our first expression on the subject. We rested our holding in that case on the authority of New York decisions

which are there cited. Referring to them, the court, at page 111, said:

> "* * * it was further held that a deed executed by a person non compos mentis was not only voidable, but absolutely void. As we understand these decisions, they mean simply that a deed regular on its face will be declared void whenever the testimony submitted shows that the person executing it *was at the time of its execution non compos mentis.*" (Emphasis ours.)

It may be unnecessary to observe that the phrase "non compos mentis" is a very general term, embracing all varieties of mental derangement, and means not of sound mind. Black's Law Dictionary (4th ed) p 1200. Also see Blakiston's New Gould Medical Dictionary (1st ed) p 675.

Since the Farley case, we have consistently held that a deed of a person so afflicted is void unless executed during a lucid interval.

■ The rule with respect to the mental capacity of a grantor necessary to execute a valid deed is, as stated by Justice BURNETT, in *Wade v. Northup,* 70 Or 569, 578, 140 P 451. *"If at the time of the execution of the document* the grantor has mental capacity sufficient to comprehend the nature of the business in which [he] was engaged, the instrument is valid." (Emphasis ours.) Also see cases cited therein and *Graham v. Allen,* 116 Or 501, 508, 241 P 1007; *Rowe v. Freeman,* 89 Or 428, 436, 172 P 508, 174 P 727; *Laughlin v. Ludgate,* 138 Or 442, 450, 6 P2d 20; *First Christian Church v. McReynolds,* 194 Or 68, 72, 241 P2d 135.

Those moments when the mentally ill recoup for the time being a mental capacity sufficient to comprehend the nature of the business or other matters in which they are then engaged, even though they shortly

thereafter relapse to a status of incomprehension caused by their mental disorder, are known to both medicine and the law as "lucid intervals." It is in these temporary moments of emergence from mental darkness to the light of rational understanding, be they of long or short duration, when the mentally ill attain a competency sufficient to execute a valid instrument. Deeds or other conveyances and contracts made by insane persons during such lucid interval are valid and enforceable. 2 Black, Rescission and Cancellation (2d ed), 734 § 261.

Lucid interval, as we use it, is defined in 44 CJS 36, Insane Persons § 2 as follows:

"A lucid interval, as used in speaking of lucid intervals of insane persons, is not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind sufficiently to enable the person soundly to judge of the act; such a full return of the mind to sanity as places the person in possession of the powers of his mind, enabling him to understand and transact his affairs as usual. The term does not necessarily mean complete or perfect restoration of the mental faculties to their original condition; and it is sufficient if there is such restoration that the person is able to comprehend and to do the act with such reason, memory, and judgment as to make it a legal act; * * *."

Also see 2 Black, Rescission and Cancellation, supra, p 734.

Plaintiff called five lay witnesses who testified as to plaintiff's mental condition prior to his hospitalization. One was his brother and one his sister. The other three were close friends and neighbors. It is from them we learn of the visual evidence of plaintiff's abnormal conduct and gradual deterioration which eventually dic-

tated the legal commitment to the State Hospital. Without exception, these witnesses testified to his variation from periods of abnormal to periods of normal mentality. He was described by his brother as having times when "he was not right and then other times he would be alright"; "he had good days and he had off days"; and periods when "he could carry on a conversation normally and intelligently." Such was the tenor of the witness Lentz. His friend Smejakal described the periods of return to a normal manner as of from 10 to 20 minutes duration. The witness Scrubb, a close neighbor who knew the plaintiff well, said of his mental condition: "Sometimes Joe acted to me perfectly normal, then sometimes he didn't."

This lay evidence of lucid periods from a few minutes to long periods of time accords with the character of plaintiff's particular type of mental malady as diagnosed by Dr. Bower, plaintiff's only medical witness. He stated on direct examination that persons suffering from schizophrenia have at times lucid intervals. Later, and in response to questions by the court, Dr. Bower testified that a person with a "paranoid condition with schizophrenic tendencies" in a lucid interval, if long enough, could exercise the judgment of a normal person, i.e., "would  *  *  *  understand the consequences of their act and be able to judge and evaluate things like an ordinary person" could do. The doctor also indicated that it was possible for plaintiff around the nineteenth to twenty-second of May to have had lucid intervals which would last for "a day or two or three days."

■ Thus, we find very persuasive evidence from friends and relatives that plaintiff during the period of his mental illness and prior to his confinement in the State Hospital was given to periods of lucidity of

varying duration. This, as we have seen, receives professional support from the statements of Dr. Bower.

We have carefully examined the record relating to the deed matter, keeping in mind plaintiff's capacity for possible lucid moments as testified to by his relatives, friends and the psychiatrist. We find that prior to May 19, 1953, the plaintiff and defendant Currin were utter strangers. Currin had never seen or heard of Vandecoevering until he entered his real estate office in Hillsboro on that date. The plaintiff approached Currin by asking him if he would be interested in buying a piece of property for cash if he could get it for less than its value. Currin asked his name and wrote it upon his map showing the quarter section which plaintiff described to him. When asked what he wanted, Vandecoevering said he had been offered $1,850, but would sell for $2,000. We interpolate to say plaintiff had received an offer of $1,850 from Crown Zellerbach Corporation a month or two before as a potential tree farm. He told Currin he was in a hurry to leave Oregon. After spending about 20 minutes in the Currin office, he left. Later in the day, and by previous arrangement, Currin met plaintiff at his ranch, where plaintiff conducted him over the place during the 45 minutes they were there. Nothing unusual or abnormal on the part of plaintiff transpired at that time. In the course of this viewing of the premises, plaintiff, among other things, pointed out the corners of his property and, as plaintiff testified at the trial, he also told Currin while on the place that the strawberry plants were old and of practically no value.

The survey of the Vandecoevering place was concluded by the parties going into the dining room of plaintiff's house, where Currin gave him an earnest money deposit in the form of a check for $300. Plain-

tiff then authorized Currin to order a title policy. A cancelled check of that date and amount is in evidence. It was made sufficiently large to place plaintiff in position to pay his taxes. This must have promptly been done by plaintiff, as the check issued also bears the endorsement of the Sheriff and Tax Collector of Washington County and the title report, dated May 19, 1953, reports 1952-53 taxes paid.

On May 22, three days later, plaintiff returned to Currin's office as requested. The title report being satisfactory, plaintiff then received Currin's check for $1,675.30 upon the execution and delivery of his deed. This was the balance of purchase price due after allowing for the previous check of $300 and a disbursement made to the local abstract company for its report.

Mr. Wildman, a salesman for Mr. Currin, was the first person to greet plaintiff when he came to Currin's office on the nineteenth. He directed him to defendant and observed him while he was conversing with Mr. Currin and was close enough to overhear most of the conversation passing between them. Mr. Jenkins, a son-in-law of defendants (admitted to the bar in September, 1953), drew the closing papers and deed on May 22, and, as a notary public, took plaintiff's acknowledgment to the contested conveyance, all of which took approximately one-half hour. Mr. Currin and the two men just mentioned were the only persons with whom plaintiff had contact during any phase of the transaction. They all testify that there was nothing abnormal about plaintiff's conduct or appearance to arouse any suspicion that he was mentally ill. Currin says that at no time did plaintiff solicit his judgment or opinion as to the value of the property. He insists that the price of $2,000 was plaintiff's first offer for cash.

On the day of sale, May 22, plaintiff deposited the large check received from Currin in The Commercial Bank of Commerce of Hillsboro, shortly went to Portland, Oregon, where he found accommodations, and proceeded to squander his money over a short period of time by drinking and gambling.

Our examination of the record indicates a complete absence of any evidence of fraud or overreaching or inequitable conduct of any kind on the part of the Currins or anyone associated with them. There is no warrant for claiming that a fiduciary or confidential relationship existed between the parties. It is true that plaintiff's place might have commanded a higher price if listed with a real estate broker or if sold on time and not for cash as demanded by grantor in order to produce a quick sale. Although different parties gave different and higher values than plaintiff was pleased to take, the difference between what he received and what he might have received later if content to list his place for sale and wait was in no sense so shocking as to suggest a gross inadequacy of consideration.

■ Relying on the evidence which disclosed Vandecoevering was subject to rational and lucid intervals, the medical testimony indicating they were not unusual to one suffering with his malady, and the detailed account of his transaction with Mr. Currin, we find no difficulty in holding that plaintiff was experiencing a period of rationality and lucidity when he dealt with Currin and at that time the grantor had "mental capacity sufficient to comprehend the nature of the business in which [he] was engaged." *Wade v. Northup,* supra. Under the circumstances, the deed must be viewed as valid.

We cannot close this opinion without this reference to the plaintiff as he testified in the case. Depending

upon the reported record, only, we are impressed with the clarity of his responses to questions of counsel and the relevancy and coherence of his replies. His own conduct on the stand is one of sharp contrast to others testifying in his behalf. Even the judge during the course of the trial, addressing himself to Dr. Bower, was moved to remark on the clarity of plaintiff's testimony. In this situation we have a unique and convincing example of how much more valuable are the observations of a trial judge in matters of this kind than those of an appellate court having to depend solely upon a cold printed record. Reading the transcript, it is difficult to believe from plaintiff's manner of testifying that he had ever labored under any kind of mental handicap or that the nature of his illness was so severe as to sometimes make his physical restraint necessary. On the other hand, his testimony and his conduct on the stand becomes a confirmation by demonstration that plaintiff's departures from mental norm can be interrupted and are interrupted by lucid intervals when the sunshine of reason breaks through the dark clouds of mental unreality which presently separate him from the ways of a normal life and living.

Affirmed.

KESTER, J., not participating.