Argued March 6, affirmed June 13, 1962

IN THE MATTER OF THE ESTATE OF
ALETHA LODEMA COOK, DECEASED
KASTNER *v.* HUSBAND
372 P. 2d 520

*Kenneth A. Morrow,* Eugene, argued the cause for appellant. On the brief were Venn, Mulder & Morrow, Eugene.

*Ralph E. Hillier,* Eugene, argued the cause for respondent. On the brief were Husband, Johnson, Hillier and MacInnis, Eugene.

Before McALLISTER, Chief Justice, and WARNER, SLOAN and O'CONNELL, Justices.

WARNER, J.

This is a will contest. Charles B. Kastner, the plaintiff-contestant, is a nephew of the decedent and brings this suit for the benefit of himself and nine other alleged heirs of Mrs. Cook. He claims the decedent lacked testamentary capacity when she executed the subject will. That act was accomplished on March 25, 1958, in the law office of Donald R. Husband, an attorney, practicing in Eugene, Oregon.

Mrs. Cook was 68 years old at the time she made her will. She had been married and widowed twice. No children had been born to either union and she lived alone in her Eugene home.

Mr. Husband and his secretary, then Hazel M. Gates, acted as witnesses. Subsequent to Mrs. Cook's death, on May 3, 1960, the will was admitted to probate and Mr. Husband, as the testamentary nominee, was appointed executor of the Cook estate. From a decree dismissing the petition, the contestant appeals.

There can be no doubt that Mrs. Cook was mentally ill for some time prior to the date she commissioned Mr. Husband to draw her will and that status continued for a long time after its execution. Her condition became very manifest after she left Mr. Husband's office on March twenty-fifth and so seriously so that she was taken into custody by the police and confined until her formal commitment to the State Hospital the day following. Her illness on occasions took the form of auditory hallucinations, i.e., the hearing of voices. She also had a persecution complex. The doctor who examined her at the time of her commitment and doctors from the State Hospital who testified were united in their diagnosis and described her mental ailment as schizophrenic reaction, schizo-affective type with marked paranoid trends.

It is the contention of the proponent that notwithstanding the serious character of Mrs. Cook's illness before and after the time she executed the will, she was mentally competent during a lucid interval which prevailed while she was in his office for the purpose of supplying the necessary information relative to her property, her proposed beneficiaries and the extent of their respective legacies. On Mr. Husband, as the executor, devolved the burden of proving the due execution of the will and the testamentary capacity of the testatrix. *In re Southman's Estate,* 178 Or 462, 480, 168 P2d 572 (1946).

ORS 114.020 permits all persons of sound mind of 21 years of age and upward, or who have attained their majority, as provided by ORS 109.520, to bequeath or devise their estate, real and personal, with certain restrictions not applicable in the matter at bar.

We have held that no particular degree of acumen will serve as a standard for mental capacity and

that each case is to be decided upon its own facts and circumstances. *In re Estate of Riggs,* 120 Or 38, 48, 241 P 70, 250 P 753 (1926); *Meister v. Finley,* 208 Or 223, 231, 300 P2d 778 (1956).

■ The requirements of sound-mindedness or mental competency, as used in ORS 114.020, have been frequently stated by this court and may be summarized as follows: (1) the person must be able to understand the nature of the act in which he is engaged; (2) know the nature and extent of his property; (3) know, without prompting, the claims, if any, of those who are, should or might be, the natural objects of his bounty; and (4) be cognizant of the scope and reach of the provisions of the document. If the foregoing conditions are found to prevail at the time of executing the instrument, the testator is deemed to have sufficient capacity to make a will. *Re Phillips' Will,* 107 Or 612, 618, 213 P 627 (1923); *In Re Walther's Estate,* 177 Or 382, 386, 163 P2d 285 (1945); *In Re Estate of Verd Hill,* 198 Or 307, 317, 256 P2d 735 (1953).

■ We have also recognized that a will made by an insane person may be valid if made during a lucid interval. *In Re Faling Will,* 105 Or 365, 445-446, 208 P 715 (1922); *Snyder v. DeRemer,* 143 Or 414, 417, 22 P2d 877 (1933); *In Re Southman's Estate,* supra (178 Or at 480); 94 CJS 741, Wills § 36; 57 Am Jur 89, Wills § 77.

In *Pioneer Trust Co. v. Currin,* 210 Or 343, 348, 311 P2d 445 (1957), we defined a "lucid interval." We there adopted and applied the following from 44 CJS 36, Insane Persons § 2:

" 'A lucid interval, as used in speaking of lucid intervals of insane persons, is not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind sufficiently

to enable the person soundly to judge of the act; such a full return of the mind to sanity as places the person in possession of the powers of his mind, enabling him to understand and transact his affairs as usual. The term does not necessarily mean complete or perfect restoration of the mental faculties to their original condition; and it is sufficient if there is such restoration that the person is able to comprehend and to do the act with such reason, memory, and judgment as to make it a legal act; * * * ,''

■ Previous to the drawing of Mrs. Cook's will, Mr. Husband served her in other professional capacities and on several of those occasions she had indicated a desire to make a will. Later, and several days before the time fixed, she arranged for an appointment, and on March 24, 1958, she came to his office for that express purpose. At this time she discussed the will with Mr. Husband and supplied him with the details of her testimonial wishes. The following day, by appointment, she returned to execute the document which embodied the data furnished the day before. What transpired in the law offices of Mr. Husband is gathered from his testimony and that of his secretary. The latter was present at the interviews had with Mrs. Cook from the time the dictation began on March twenty-fourth and during the entire conference on the twenty-fifth.

We summarize as follows the uncontradicted testimony of what transpired in Mr. Husband's office in connection with the drafting and execution of the will: Mrs. Cook made and kept the appointment for 1:30 on the afternoon of March 24, 1958. It was then she disclosed to Mr. Husband her ownership of certain real property which she described as being her residence. She also told him of her savings account in Pacific

First Federal Savings & Loan Bank and the amount therein. She advised him that she was the recipient of certain pension checks from the Railroad Retirement Fund and some from Social Security. All of this information was correctly given. She further disclosed her ownership of certain stock and gave the name of the company issuing the same, but was unable to recall the specific stock series designations. Recalling that the stock referred to was in her safe-deposit box numbered 453 in the Citizen's Bank, in Eugene, she later went to the bank, withdrew the box and returned to the Husband office so that he could verify what she had told him concerning the stock certificates. She demonstrated her recollection of certain items of personal property in the nature of family heirlooms or treasured antiques, effects having more than intrinsic value, and furnished her attorney the names of her proposed legatees for each and every item. She gave him not only the names of her legatees, but advised him of her relationship to these parties; that is, whether they were relatives or friends, and gave him specific addresses of all of her beneficiaries who lived outside of Oregon. (There were three in that category living at different places.) She also mentioned some distant relatives to her attorney and told him why she was making no provision for them, indicating that they were not close to her or had not been nice to her and that she did not want them to have any of her property. It was Mrs. Cook who directed that a certain funeral home handle her funeral arrangements and she was very positive concerning the manner of the final disposition of her remains. These directions were respectively incorporated in the will as the third and second articles. The will also reflects her wishes as conveyed to Mr. Husband. She listened to the complete dictation of her proposed will on March twenty-

fourth and interrupted to furnish additional information during the course of the dictation.

Thereafter, she made an appointment to come to Mr. Husband's office the next day at the same hour for the formal signing of the instrument. Mrs. Cook returned at the appointed time, read the document, expressed her satisfaction with it, and executed it without change. The testatrix then initialed each separate page, as did Mr. Husband and his secretary, who acted as her subscribing witnesses.

From the evidence concerning Mrs. Cook's conduct and mental grasp of the purpose of her conferences with her attorney on March 24 and 25, 1958, we are of the opinion that a "lucid interval" was apparent and continued down to the moment of the will's execution. The completeness of her knowledge of her property, both in kind and extent, and her firmly expressed directions as to how her estate should be divided among her designated beneficiaries, are indicative to us of a momentary mental competency with a clarity normally expected of persons of younger years, unafflicted by any mental or physical impairment.

We also find support in the testimony of Dr. White, one of the doctors who examined Mrs. Cook at the time of her commitment to the State Hospital on March twenty-sixth, and the testimony of Dr. Gaver, a psychiatrist, and member of the staff of the hospital, who examined her at the time of her entry and thereafter followed her case while she was a patient in that institution. Both were called in behalf of the contestant and both testified that a person severely disturbed mentally can have lucid moments. In response to hypothetical questions which embodied, among other things, consideration of the various things said and done by Mrs. Cook while in the office of Mr. Husband during the formulation and execution of her last will, both

answered in substance that they represented a lucid interval evidencing mental competency during that period.

■ Witnesses to the periodic or momentary transition from a mental state of uncontrolled irrationality to one of mental lucidity and rationality, as above defined, are not always the same persons who stand by for the moment to formally witness a testator's execution of his last will and testament. Here, however, Mr. Husband and his secretary are presented in the dual roles of attesting to the testatrix's conduct during the important preliminary stage of preparing the will from information supplied by her as the pattern for the draft of the will in its final form, and as witnesses required by law to its final and formal execution by the testatrix. In their latter capacity as attestors to the signature of the testatrix, the law has accorded a special weight and significance. Our first statement of the rule is found in *Heirs of Clark v. T. A. and J. D. Ellis,* 9 Or 128 (1881), where Mr. Chief Justice LORD (at 147) adopted as the controlling doctrine a statement of Judge Washington, reading: " 'The evidence of the attesting witnesses, and next to them, of those who were present at the execution, all other things being equal, are most to be relied upon.' " In essence, though sometimes in slightly different language, the foregoing rule has continuously prevailed in this jurisdiction. *Pickett's Will,* 49 Or 127, 131, 89 P 377 (1907). See, also, 1 Alexander, Law of Wills (1917), 435, § 327. Here, we have the further testimony of the attorney and his secretary as subscribing witnesses affirming the mental competency of the decedent at the moment she signed and published her will.

Affirmed.