Argued September 27, affirmed November 1, reconsideration denied
December 8, 1976, petition for review denied January 25, 1977

In the Matter of the Estate of Ralph Crum, Deceased
HOOVER, *Appellant,*
*v.*
TROWBRIDGE et ux, *Respondents.*
(No. 5930, CA 5497)
555 P2d 785

*Chester Scott,* Independence, argued the cause and
filed the briefs for appellant.

*Robert S. Lovlien,* Bend, argued the cause for respondents. With him on the brief were Gray, Fancher, Holmes & Hurley, Bend.

Before Schwab, Chief Judge, and Fort and Thornton, Judges.

FORT, J.

## FORT, J.

This matter arises out of a controversy between two sisters, Nelda Hoover and Opal Trowbridge, concerning the validity of their father's will. The trial court, after a three-day trial, admitted the will to probate, pursuant to the petition of its proponents, Opal Trowbridge and her husband, Logan Trowbridge. Prior to the admission of the will, Nelda Hoover had been appointed representative of their father's intestate estate. She appeals, urging first that at the time of the execution of the will the decedent lacked testamentary capacity, and, second, that he was subjected to undue influence by his daughter, Opal Trowbridge. She also contends that a confidential or fiduciary relationship existed between the decedent and Mrs. Trowbridge before, at, and following the execution of the will, and that therefore the burden to establish the lack of undue influence rested upon the proponent of the will, Mrs. Trowbridge.

The trial court in its opinion summarized the facts:
"* * * * *

"* * * The decedent and his wife had three children, Norman Crum, a son; Opal Trowbridge, a daughter; and Nelda L. Hoover, the contestant, a daughter. The decedent and his wife lived in The Sisters, Oregon area and on or about 1950 Opal Trowbridge moved to Sisters locating across the street from the residence of the mother and father. Mrs. Trowbridge continued to reside near her mother and father intermittently and for a period of approximately ten years. During that period of approximately ten years she performed such services as washing clothes, cleaning house, working in the yard and cooking frequent meals for her mother and father until her mother died in 1958. Subsequently Norman then resided with his father, and Mrs. Trowbridge continued to perform the same services for her father and her brother all on a fairly frequent basis until her father moved from Sisters, Oregon. In 1966 the decedent acknowledged the services of his daughter to one Mrs. Elman, a neighbor and friend of the decedent that Mrs. Trowbridge had stayed home and had taken care of him

and said, 'Everything I have is hers—she has earned it'. Prior to 1966 the decedent and Norman Crum had a joint savings and checking account with the United States National Bank in Bend, and on December 13, 1966 the decedent and Norman Crum authorized, by duly executed signature cards, Opal Trowbridge to withdraw funds from said bank accounts. In the interim period Mrs. Trowbridge had deposited certain funds of her own in said accounts, and on and after June 23, 1967 Mrs. Trowbridge withdrew not only her own funds at various times from the bank, but also those of her father and brother for the purpose of paying their necessary living and household expenses all as directed by the decedent and or her brother. On September 23, 1968 Norman died after a short illness. On October 1, 1968 the decedent executed a new designation of beneficiary of a $5,000.00 life insurance policy naming Mrs. Trowbridge as the principal beneficiary. The former designation executed February 28, 1959 provided that Norman Crum was the principal beneficiary and Opal Trowbridge and Nelda Hoover, both daughters, as contingent beneficiaries. At the time the decedent executed such designation, the evidence established that he was well aware of the effect of his act, that he was mentally competent, and that he was acting normally and in his usual manner.

"On October 2, 1968 the decedent had in his possession the Last Will and Testament and arrived at the home of Mrs. Trowbridge and requested that Mrs. Trowbridge transport himself and a friend of the family, one Emogene Haynes, who was then visiting Mrs. Trowbridge and one Mr. Ward Barrett, another friend, to the office of Jesse F. Smalley for the purpose of executing and witnessing the decedent's Last Will and Testament. Mrs. Trowbridge complied, and the parties traveled to the office of Mr. Smalley and while in the office the decedent produced the Will, Mr. Smalley appeared to read it. The decedent also appeared to read the document and he executed the same in the presence of the two witnesses who affixed their names thereto as witnesses. Mrs. Trowbridge was not present during the execution of the Will but remained in another room or area. The Last Will and Testament was then left with Mr. Smalley, and the four parties left and returned home. Mr. Smalley was an insurance and real estate

broker in Sisters and maintained an office in a hotel in Sisters. Mr. Smalley was known generally to engage in the practice of law and to prepare wills. He was not an attorney. It can be concluded reasonably that Mr. Smalley prepared the Will in question. Mrs. Trowbridge was not aware of the provisions of the Will until later in the afternoon of October 2, 1968 when her father delivered the Will to her asking her to read it.

"Mrs. Trowbridge then inquired of the decedent if that was the disposition he really wanted to make of his property to which the decedent replied, 'Yes, otherwise I would not have done it.'

"* * * * *

"The testimony of Mrs. Emogene Haynes, as one of the subscribing witnesses to the Last Will and Testament is entitled to great weight. She testified that the decedent was aware of his act, that he requested her to witness the Will as a witness, and that he acted normal and usual in every respect and was mentally competent.

"* * * * *."

Essentially on the basis of these facts the court concluded that at the time of the execution of the will the decedent had testamentary capacity and that the will was not executed as the result of undue influence by Opal Trowbridge.

■ We turn first to the question of decedent's testamentary capacity at the time he executed the will. In *Kastner v. Husband,* 231 Or 133, 372 P2d 520 (1962), our Supreme Court said:

"We have held that no particular degree of acumen will serve as a standard for mental capacity and that each case is to be decided upon its own facts and circumstances. *In re Estate of Riggs,* 120 Or 38, 48, 241 P 70, 250 P 753 (1926); *Meister v. Finley,* 208 Or 223, 231, 300 P2d 778 (1956).

"The requirements of sound-mindedness or mental competency, as used in ORS 114.020, have been frequently stated by this court and may be summarized as follows: (1) the person must be able to understand the nature of the act in which he is engaged; (2) know the nature and extent of his property; (3) know, without prompting, the claims, if any, of those who are, should or

might be, the natural objects of his bounty; and (4) be cognizant of the scope and reach of the provisions of the document. If the foregoing conditions are found to prevail at the time of executing the instrument, the testator is deemed to have sufficient capacity to make a will. *Re Phillips' Will,* 107 Or 612, 618, 213 P 627 (1923); *In Re Walther's Estate,* 177 Or 382, 386, 163 P2d 285 (1945); *In Re Estate of Verd Hill,* 198 Or 307, 317, 256 P2d 735 (1953)." 231 Or at 135-36.

From our review of the testimony, particularly that of the subscribing witness, Mrs. Haynes, we think the proponents offered ample evidence in each of the named categories to sustain the conclusion that at the time of execution of the will the decedent did possess testamentary capacity. The fact, urged by appellant, that decedent executed the will only a few days after his son's death and while he was still deeply grieved as a result of it does not itself establish a lack of testamentary capacity. For example, such action is consistent with a desire not only to accomplish the readjustment of his affairs that such an event might normally precipitate, but also to eliminate the concerns and uncertainties that the failure to decide and act upon such important matters frequently gives rise to. Furthermore, although it is conceded that the decedent was a heavy drinker, there was no substantial evidence that at the time of the execution of the will he was in any observable way affected by liquor or that on that day he was drinking at all. The evidence is to the contrary.

Thus applying the rules of *Kastner,* we conclude, as did the trial court, that the decedent at the time he executed his will did possess testamentary capacity.

The trial court also concluded that there had been no showing of a confidential relationship between the decedent and his daughter, Opal Trowbridge. We will next consider that ruling. Recently in *Walls v. Small,* 26 Or App 105, 551 P2d 1310, Sup Ct *review denied* (1976), we said:

"The contestants' sole contention on appeal is that the

October 1967 will was the product of undue influence exercised by the Smalls upon the testatrix. They argue that a confidential relationship existed between the testatrix and the Smalls and that this, coupled with the numerous 'suspicious circumstances' present, places the burden on the proponent to show the lack of undue influence, citing *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886 (1958).

"The contestants contend that the following suspicious circumstances discussed in *Reddaway* are present here: (1) the participation of the Smalls in the preparation of the will; (2) a lack of independent advice; (3) secrecy and haste in the execution of the will; (4) a change in the testatrix's attitude toward others; (5) a change in the testatrix's plan of disposing of her property; (6) unnatural and unjust gifts; and (7) the testatrix's susceptibility to influence.

"First, we agree with contestants that a confidential relationship existed between the Smalls and the testatrix. They lived together for 10 months before the execution of the will. The Smalls to a large extent handled the testatrix's financial affairs during that period. We believe that the above, plus the fact that the testatrix and Mrs. Small were sisters, is sufficient proof of a confidential relationship.

"We now must determine whether sufficient suspicious circumstances existed to shift to proponent the burden of proving a lack of undue influence. Where a confidential relationship exists, only slight additional evidence is necessary to cause the burden to shift. *In re Reddaway's Estate, supra; In re Estate of Elise Rosenberg,* 196 Or 219, 246 P2d 858, 248 P2d 340 (1952)." 26 Or App at 108-09.

Here the evidence is uncontradicted that Opal Trowbridge at, prior to and for some time after the execution of the will transacted much financial business for her father and, prior to his death, for her brother Norman; that she was a joint signatory on their bank accounts, continued so on her father's after her brother's death, and on occasion mingled her own funds with her father's in his account. She regularly exercised this power. She also resided across the street from him for many years and was a frequent visitor in

his home, performing many tasks for her father, and in general assisted and was relied upon by him in a wide variety of ways. As in *Walls v. Small, supra,* therefore, we conclude that prior to, at, and for some time after the execution of the will a confidential relationship existed between Mrs. Trowbridge and the decedent. The burden was therefore upon the proponents to establish the absence of undue influence by Opal Trowbridge upon the decedent.

In *In Re Reddaway's Estate,* 214 Or 410, 329 P2d 886 (1958), the Supreme Court discussed the effect in a will contest of the existence of a confidential relationship as follows:

> "* * * This court has held that where a confidential relation exists between a testator and the beneficiary, slight evidence is sufficient to establish undue influence. *In re Estate of Elise Rosenberg,* 196 Or 219, 246 P2d 858. The rule is more specifically stated in *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572 (1946), as follows:
>
> > " 'The existence of a confidential relationship * * * when taken in connection with other suspicious circumstances may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference. * * *'
>
> It will be noted that the burden does not exist unless there are circumstances in addition to the confidential relation. As was said in *Roblin v. Shantz, Executrix,* 210 Or 371, 378, 311 P2d 459 (1957), 'We must be shown suspicious circumstances.' * * *" 214 Or at 420.

It there found that suspicious circumstances existed "because here the 'relationship is such as to indicate a position of dominance by the one in whom confidence is reposed over the other.' * * *" 214 Or at 421. We do not here find, however, that Opal Trowbridge exercised "a position of dominance" over her father.

The court in *Reddaway* considered both what constitutes undue influence and, when present, what its effect may be. Concerning the latter, the court said:

> "Definitions of undue influence couched in terms of the testator's freedom of will are subject to criticism in

that they invite us to think in terms of coercion and duress, when the emphasis should be on the unfairness of the advantage which is reaped as the result of wrongful conduct. 'Undue influence does not negative consent by the donor. Equity acts because there is want of conscience on the part of the donee, not want of consent on the part of the donor.' 3 Modern L Rev 97, 100 (1939). Said in another way, undue influence has a closer kinship to fraud than to duress. It has been characterized as 'a species of fraud.' 214 Or at 419-20.

Concerning the former, the court said:

"* * * Briefly stated, that principle is that the law will not permit improper influences to control the disposition of a person's property. We speak of this in the law as 'undue influence.' The term, like so many other legal terms, cannot be specifically defined. A typical definition is found in *Porter v. United States National Bank of Portland,* 192 Or 483, 492, 235 P2d 894 (1951), where it was said:

" 'The theory which underlies the doctrine of undue influence is that the testator is induced by various means to execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of testator. Such an instrument, in legal effect, is not a will at all. Although executed by the testator, his intention to make a will is so defective that the instrument is invalid.'

This is simply a manner of expressing the idea that but for the wrongful influence exercised upon the testator he would not have executed the will. As pointed out by Mr. Justice ROSSMAN in *In re Kelly's Estate,* 150 Or 598, 617, 46 P2d 84 (1935), every will is the product of some kind of influence. It is the task of the courts to determine whether the influence in the particular case is 'undue'.

"* * * * *

"* * * The question is, has the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper? * * *" 214 Or at 418-19.

In *Walls v. Small, supra,* we said:

"* * * The crucial factor in determining the persua-

[ 239 ]

siveness of conflicting evidence is the credibility of the witnesses involved. Here, the trial court saw and heard the witnesses; we, of course, did not. The trial court by finding the will not to be the product of undue influence, necessarily found the testimony of the proponent to be credible and persuasive. In such cases the decision of the trial court is entitled to great weight. *Clauder v. Morser,* 204 Or 378, 282 P2d 352 (1955); *Whitteberry v. Whitteberry,* 9 Or App 154, 496 P2d 240 (1972)." 26 Or App at 109.

*See also: In Re Reddaway's Estate, supra,* 214 Or at 427; *Nease v. Wilson, Clark,* 6 Or App 589, 488 P2d 1396, Sup Ct *review denied* (1971).

■ Applying the foregoing rules to the facts of this case, we do not find that Opal Trowbridge by her conduct "gained an unfair advantage by devices which reasonable men regard as improper" over her father prior to or at the time of the execution of the will. Thus we conclude that proponents established that undue influence was not exercised by Opal Trowbridge to secure the drafting or execution of the challenged will.

■ The final contention made by appellant is that the trial court erred in refusing to receive into evidence a packet of letters written by the decedent to his daughter Nelda Hoover and her husband about two years after the execution of the will.

The record reveals, following identification and offer of the letters:

"MR. LOVLIEN [respondents' counsel]: These are all postmarked between June of 1970 and December of 1970. I object on the grounds that they're not relevant to the issue of testamentary capacity since the alleged will was written two years prior to that and was executed and signed two years prior to that, and I don't see where they'd be relevant to the issue of that.

"MR. SCOTT [appellant's counsel]: They are relevant, your Honor, to the issue of undue influence. There are at least three areas where they are relevant. One is the change of attitude of the decedent to his daughter Nelda Hoover who he allegedly disinherited; second would be a change in his—would be whether or not he

[ 240 ]

intended an unnatural disposition. The Contestant's contention is that at a time when he did not have alcohol and was under medical care and in normal condition he loved his daughter. It goes to show that if in fact the will was signed, it was signed at a time when he was under the influence of Mrs. Trowbridge.

"THE COURT: Sustain the objection."

If in fact the letters contained statements by the decedent which reflected directly, as contended in the offer, upon the issues of testamentary capacity or undue influence as of the time of the execution of the will, they were admissible. We cannot tell from the record whether the trial court examined them for this purpose prior to sustaining the objection. Accordingly, we have examined the letters in our de novo capacity. We find nothing in them to cause us to reach a different conclusion from that already expressed— namely, that decedent possessed testamentary capacity and that he was not acting under undue influence at the time he executed his will.

Affirmed.