Argued January 8, reversed and remanded with instructions
February 14, 1968

GEIGER, *Appellant, v.* PALMER ET AL,
*Respondents.*

437 P. 2d 750

*William F. Paterson,* Portland, argued the cause for appellant. With him on the brief were Paterson & Paterson, and Brian W. O'Brien, Portland.

*Michael M. Sherlock, Jr.,* Portland, argued the cause for respondent. With him on the brief were Robeson, Collier & Sherlock, Portland.

Before SLOAN, Presiding Judge, and GOODWIN and HOLMAN, Justices.

HOLMAN, J.

This is a suit to cancel both a conveyance of title and a grant of an easement on grounds of lack of mental capacity and undue influence. The plaintiff appeals from a decree for defendant.

Plaintiff is the administratrix of the estate of Miss

Queen Cheadle, who executed the documents in question. Miss Cheadle was in her late 80's at the time of their execution. Both documents involved her home property located near Bridal Veil in the Columbia River Gorge. After her retirement from school teaching she lived on the premises alone until January 22, 1962, when she moved into Terwilliger Plaza, a retirement home in Portland. She subsequently became unable to care for herself there and moved to the Carlton Hotel on December 3, 1962, where more intensive care was available. Miss Cheadle suffered from lack of hearing, failing eyesight, and at times had difficulty in walking without the aid of a crutch or cane. A guardian was appointed for her on May 27, 1964. She died on June 21, 1965, at the age of 90.

The easement was executed April 28, 1962, in favor of the defendant Western Telephone System, Inc. (Western). This corporation and all other corporate entities hereinafter mentioned in this opinion were controlled and owned by the defendant Martin V. Palmer, who dealt with Miss Cheadle. The easement was for conducting electrical current both above and below ground and covered the entire parcel of two acres. The document recited consideration of $1.00.

The deed was executed on April 25, 1963, for a consideration of $3,750. There was a 20 year-old, seven room house on the land. At the time of the delivery of the deed, the house had been vacant for 15 months and was in some disrepair. It had a full view of the Columbia River Gorge. The property was conveyed to Martin V. Palmer, Inc., a Washington corporation, which subsequently conveyed the property to the Columbia River Gorge Development Corporation, an Oregon corporation.

We will first discuss the evidence of lack of mental

capacity on the part of Miss Cheadle. There was testimony that she was forgetful and could not learn to use her telephone which operated differently than most telephones. A real estate broker, a woman friend of Miss Cheadle, testified that Miss Cheadle had requested help to sell the property, but no listing had ever been taken. The witness said she displayed her sign on Miss Cheadle's property, but made no active effort to sell it. She testified that Miss Cheadle was confused and forgetful. If a purchaser had been secured, the witness stated, she would not have completed the transaction without the appointment of a guardian because she did not believe Miss Cheadle to be competent to make the transfer.

On the other hand, the manager of the Terwilliger Plaza testified that in his opinion Miss Cheadle was mentally competent at the time she lived there. The lawyer who drew the deed and explained the transfer to Miss Cheadle was of the opinion that she understood the transaction.

■ It is the court's opinion that there was an adequate basis for the trial court's finding that Miss Cheadle was mentally competent. Though debilitated by age so that probably she was not as capable of exercising independent judgment as formerly, it would not follow that she lacked the capacity to understand the nature of the transaction in question. The evidence was conflicting and we are not prepared to say that the trial court was wrong in its finding.

We will now consider the evidence of undue influence on the part of the defendant Martin V. Palmer. The easement was secured by Palmer while Miss Cheadle was residing at the Terwilliger Plaza. A Mr. Haywood, who worked for Western, testified that Palmer told Miss Cheadle that the easement was neces-

sary to give her telephone service. She already had service from Western prior to the easement. The easement covered the entire parcel of two acres and was in fact for a main line. No known consideration was given. At the time of trial, Western was no longer servicing the property and was not in operation.

The deed was secured by Palmer while Miss Cheadle was a resident at the Carlton Hotel. Mr. Haywood testified that he offered Miss Cheadle $5,000 for the property shortly before she moved from the premises. He said it was worth more but $5,000 was all the money he could raise. He stated that when he started talking money, Miss Cheadle told him she would have to talk it over with Palmer. Haywood subsequently made the offer to Palmer but never heard anything further.

Haywood also testified that he took some people by the name of Smith to see Miss Cheadle at the Terwilliger Plaza. He said they offered $8,000 for the property and Miss Cheadle immediately said she wanted $12,000. Haywood said Palmer was present and told the Smiths that he would talk to Miss Cheadle. Nothing came of the offer.

Mr. Hogan, a former employee of Western, testified that he was present when Palmer talked to Miss Cheadle at the Terwilliger Plaza about the Haywood offer. Hogan said that Palmer told Miss Cheadle that there was no use considering the deal because Haywood could not come up with the money. Hogan also testified that while Miss Cheadle was at the Carlton Hotel he was present when Palmer discussed with her an offer of a Mrs. Rose. The offer, made through a Mr. Luscher, was for $9,000. Mr. Luscher had previously owned the property. According to Hogan, Palmer told Miss Cheadle that the offer was instigated by Luscher's desire to obtain the property again and that he

had experienced some difficulties with Luscher and she should not sell to him. Hogan also stated that Palmer told him he wanted to control for his own use all the property in the Gorge between Multnomah and Latourelle Falls. The property in question is located in the described area.

Luscher testified that in 1954 he made an offer of $8,000 to Miss Cheadle which was refused. He said that he believed the property was presently in about the same condition as it was at the time he made the offer. He also testified that Miss Cheadle subsequently had agreed to sell the property for $9,000 and then had backed out. It was not shown when this offer was made or whether Luscher was referring to the Rose offer previously discussed.

The previously-mentioned woman friend of Miss Cheadle, who was a real estate broker, testified that in her opinion the property was worth from $12,000 to $14,000 and that Miss Cheadle told her that she would sell it for $9,500 but to ask $10,500. Miss Cheadle would only sell for cash, and the witness said she had received no cash offers of the required amount.

Mr. Curtis, a builder who was a former business associate of Palmer, testified that the house alone was worth $4,000 and that the land had no value independent of the house.

The Multnomah County Assessor's evaluation of the premises for tax purposes for the year 1962-63 was $7,111.

The defendant Palmer was not present at trial and did not testify. Hence, the testimony establishing Palmer's relationship with Miss Cheadle, and the testimony of conversations with her regarding the offers was uncontradicted. There is in evidence a letter written by Palmer to Miss Cheadle's niece, which was ap-

parently in answer to a telephone call made by the niece concerning the property in question. The letter contains the following statements:

\* \* \* \* \*

"My impression of her (Miss Cheadle's) former instructions that no one was to discuss her affaris (sic) with you were confirmed."

\* \* \* \* \*

"In general most of Miss Cheadle's comments and instructions are confidential. \* \* \*"

We agree with the trial court that Palmer had a confidential relationship with Miss Cheadle. She was a maiden lady who, because of her age and physical debility, had been cut off from the mainstream of business life. She obviously relied upon Palmer for business advice and he undertook to give it. In business matters he was the dominant and she the dependent party. The relationship was not technically a fiduciary one but rather a situation in which confidence was reposed and accepted. *First Christian Church v. McReynolds,* 194 Or 68, 241 P2d 135 (1952) states as follows:

> "Ordinarily, the burden of proving undue influence rests upon the party alleging it. However, where a fiduciary relationship exists between donor and donee, there is a presumption of undue influence and the donee is required to produce evidence sufficient to establish that the gift was the free and voluntary act of the donor and that the transaction was fair and equitable. Gilliam v. Schoen, 176 Or. 356, 363, 157 P. (2d) 682, and authorities therein cited. \* \* \*" *Evans et al. v. Anderson,* 186 Or 443, 470, 207 P2d 165 (1949). Accord, *Legler et al. v. Legler,* 187 Or 273, 310, 211 P2d 233 (1949).

The Oregon cases have used the term "fiduciary relationship" interchangeably with "confidential relation" though technically they are different. No good reason appears why, in the present context, the same rule with respect to burden of proof should not apply to both.

■ The grant of the easement was without consideration. The easement was not necessary for the telephone service at Miss Cheadle's property, the purported purpose for which it was requested. It covered the entire premises and was a substantial impairment of the property's value. The presumption of undue influence raised by the confidential relation and lack of consideration is not rebutted in any manner. We therefore find that the easement was obtained by undue influence on the part of Palmer.

■ With respect to the conveyance of the house and land, there was consideration but it was markedly inadequate. No 20 year-old, seven-room house on two acres of land with a panoramic view of the Columbia River Gorge is worth only $3,750. Taking into consideration a certain state of disrepair, the preponderance of the testimony indicates that adequate consideration would have been in the neighborhood of $8,000.

"* * * Persons who occupy a position of trust or confidence towards others are held in equity to a very strict measure of candor and integrity in their dealings with them, and if property passes between them for a markedly inadequate price, it is regarded as a highly suspicious circumstance and one which will justify a very severe scrutiny of all the attending circumstances. And if, in addition to the inadequacy of consideration, it shall be found that there has been any fraud or misrepresentation, or any advantage taken of the trust and confidence reposed, equity will not hesitate to give relief.

\* \* \*" 1 Black, Rescission and Cancellation (2d ed) 492, § 172.

The acceptance of the offer of $5,000 was discouraged by Palmer because he claimed the offeror could not come up with the money. The offeror, on the contrary, testified that "$5,000 was all the money I could lay my hands on", thus indicating he had the money. Palmer discouraged Miss Cheadle from accepting the offer of $9,000 made by Mrs. Rose through Luscher, not because Palmer claimed the money was not available, but because he asserted it was an attempt by Luscher to get the property and Luscher was a person with whom he had experienced previous difficulty. When the Smiths offered $8,000 Miss Cheadle wanted $12,000. The evidence indicates the rejection by her of the offer was not because of the manner in which payment was to be made, but because she wanted more money. Her willingness to subsequently sell for $3,750 is therefore inexplicable.

It was true that the credibility of some of the witnesses who furnished this evidence was impeached. However, in the absence of a denial of any kind by Palmer, a close scrutiny of the above-recited evidence leads to the conclusion that Palmer took advantage of Miss Cheadle's confidence and misrepresented to her the advisability of accepting the other offers, for the purpose of securing her property cheaply for his own purposes.

■ The trial court held that plaintiff was guilty of laches. The easement was executed April 28, 1962, the deed on April 23, 1963. Miss Cheadle's niece was appointed guardian on May 27, 1964. The instant suit was commenced by the guardian on April 5, 1965. Miss Cheadle died June 21, 1965. Since Miss Cheadle was

under the influence of Palmer, she cannot be blamed for not suing him. The suit was commenced by the guardian a little more than ten months after her appointment. Ten months does not seem to us to be an unduly long time within which to institute the action, and we find no laches.

The decree of the trial court is reversed and the case is remanded to that court with directions to enter a decree setting aside the easement and the deed in question upon the deposit by plaintiff in court, for payment to the Columbia Gorge Development Corporation, the sum of $3,750 plus the value of any improvements made in the property by defendants and less the value of the property's use during defendants' possession.