Argued October 26, 1970, reversed January 7, petition for
rehearing denied February 9, petition for review
denied April 13, 1971

IN THE MATTER OF THE ESTATE OF FRANK NOVAK,
DECEASED.

VSETECKA ET AL, *Respondents, v.*
NOVAK ET AL, *Appellants.*
478 P2d 655

*F. P. Stager*, Salem, argued the cause and filed the briefs for appellants.

*Melvin B. Goode*, Albany, argued the cause for respondents. With him on the brief was Raymond D. Matthies, Albany.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

LANGTRY, J.

This appeal is from a decree of the circuit court setting aside the will of Frank Novak.

The decedent died December 24, 1968, at age 72. The will was made in the office and with the aid of a Stayton, Oregon, attorney on May 9, 1966. This attorney and his secretary, who attested the will, testified to little or no memory of the event.

The will left $5.00 each to five nieces, some the children of Frank's sister, Carrie, who was still living at the time the will was made but not mentioned in it, and some the children of his brother, Joe. Joe had died one month before the will was made and in it was bequeathed $1.00. He and Frank had not spoken for many years, dating back to a disagreement that arose about the time their father died in 1928. The attorney who drew the will testified on cross-examination with reference to leaving Joe $1.00:

"* * * Maybe that was put in there for a reason. Maybe I advised him to put that in * * * maybe we put that in as a safety factor."

He testified that sometimes he put such provisions in a will "* * * to chop off a lineage * * *."

The principal challenge to the will is the claim that the testator did not have testamentary capacity.

The attorney testified that he draws many wills, that if he has a question about the testator's mental capacity he calls in a doctor to examine, which he has done "15 to 20 times," but that he saw nothing about Frank that caused him to call a doctor.

Frank was a bachelor. Joe's son Frankie was made the executor and principal beneficiary of the estate. He was Frank's only male blood relative, and he, in turn, has a son named Frank. The testator apparently never had much to do with Joe's son and grandson; however, a husband of one of the nieces, a witness for those attacking the will, testified about a conversation with testator two or three years before death—that is, about the time the will was made.

> "The only comment made by Frank Novak in the presence of my wife and family was as to what a fine man Frankie was and that he was crippled up with arthritis.
> "* * * * *
> "* * * and what a fine son he had, yes."

For many years testator's sister, Carrie, had been close to testator and did much to take care of him. She was still living when the will was made, but she was not mentioned in it. However, there was testimony that she and testator had intended to make mutual wills giving each other their respective farms, but this intention was not carried through. In 1967, when Carrie was seriously ill and under guardianship, one of her daughters, who was her guardian, sold her farm and used the proceeds for her care, which made testator angry and caused him to dislike her children.

The evidence was that testator always was an "odd ball." He became increasingly slovenly so that at the time of his death his living habits and his person

were incredibly filthy. He failed to care for, and often did not feed, his livestock. Dead animals rotted about his farm, he took care of nothing, and lived on four dozen "check" eggs a week, which he cooked in a pressure cooker. Only a few people were ever allowed in his house, which was utterly filthy and lacking in any convenience. The farm was not worked and was in complete disrepair. He slept in his clothes and wore rain gear and rubber boots continuously. On the other hand, two friends, who were among the few who had been in his house as late as 1968, testified they could not say he appeared to lack mental capacity; that he had good comprehension, and seemed "normal." One of the nieces testified that he subscribed to "a lot of crazy magazines, like the Wall Street Journal * * * ."

The combination of failure in the will to remember his sister and the $1.00 provision for his one-month dead brother on the one hand, and his peculiarities on the other, led the trial court to conclude he lacked mental capacity.

"The requirements of sound-mindedness or mental competency, as used in ORS 114.020, have been frequently stated by this court and may be summarized as follows: (1) the person must be able to understand the nature of the act in which he is engaged; (2) know the nature and extent of his property; (3) know, without prompting, the claims, if any, of those who are, should or might be, the natural objects of his bounty; and (4) be cognizant of the scope and reach of the provisions of the document. If the foregoing conditions are found to prevail at the time of executing the instrument, the testator is deemed to have sufficient capacity to make a will * * * ." *Kastner v. Husband*, 231 Or 133, 136, 372 P2d 520 (1962).

See also *Martin v. U.S. National Bank,* 1 Or App 260, 457 P2d 662 (1969), Sup Ct *review denied* (1970).

In *Trombly et al v. McKenney, Ex. et al,* 191 Or 90, 228 P2d 417 (1951), the court said at 107:

"\* \* \* [T]he final test is whether the testator possessed testamentary capacity *at the time the will was executed* \* \* \*." (See also, *In re Estate of Verd Hill,* 198 Or 307, 256 P2d 735 (1953).)

In the same case the court said:

"In 1 Page on Wills, 303, § 148, the rule is stated thus:

" 'Eccentricity has no effect on testamentary capacity; and the wills of persons who are highly eccentric, and in some cases eccentric to the verge of insanity, have been upheld. \* \* \* The fact that the testator was filthy, forgetful, and eccentric, or that he was miserly and filthy \* \* \* or that he was filthy, frequently refused to eat, and would lie in bed with his clothes on \* \* \* or that he was inattentive \* \* \* does not establish lack of capacity.' " 191 Or at 106.

In *In Re Estate of Neil,* 111 Or 282, 226 P 439 (1924), the court said at 294:

"\* \* \* A man has just as much legal authority to make an unjust will as to make a fair and equitable one \* \* \*."

And in 1 Jaureguy and Love, Oregon Probate Law and Practice 289, § 296 (1958), it is said that a will is "upheld notwithstanding the fact that the court may view it as unnatural or unjust or as resulting from spite or bias."

The trial court, in a difficult decision, felt that there was evidence that testator did not know the

natural objects of his bounty and the scope and reach of the provisions of the will. But, as noted above, by the statement of the contestant's own witness, *at the time testator made the will in 1966* he had spoken well of the principal beneficiary and his son, who were testator's only male relatives and bore his name. He had shown anger and spite at about the same time against Carrie's children, and it is obvious that at that time he knew that Carrie was in precarious health.

■ The proponents have the burden of proving the will, which they did by putting on a prima facie case. There is a presumption of the testator's testamentary capacity. *Trombly* and *Hill*, supra. Where there are reasonable explanations, such as there are in this case, of what might first appear to be oversights by the testator we do not believe the presumption of his testamentary capacity is overcome.

Reversed.