Argued April 28, reversed and remanded May 19, reconsideration
denied July 15, petition for review pending

IN THE MATTER OF THE ESTATE OF SOPHIA WEIR,
DECEASED

CARLTON ET AL, *Appellants, v.*
WOLF, *Respondent.*

535 P2d 119

*William L. Dickson,* Portland, argued the cause for
appellants. With him on the briefs were Pozzi, Wilson
& Atchison and Walter L. Crow, Jr., Portland. Also
on the briefs were McIntruff, Thom, Collver & Rossi
and Cameron C. Thom, Coos Bay.

*Robert L. Thomas,* North Bend, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and LANGTRY and TONGUE, Judges.

TONGUE, J., pro tempore.

This is a proceeding to contest the will of Sophia Weir, a resident of Coos County. The mental capacity of the Testator is conceded, but it is contended that the will was the result of the undue influence of the sole beneficiary, Wayne Clawson, alias Bill Wolf. As in most will contest cases, the facts are of extreme importance.

*The Facts.*

A previous will was executed by Mrs. Weir on December 28, 1971, naming one of her two daughters, Louise Carlton, as her sole beneficiary. At that time Mrs. Weir and a hired man lived on her farm. In May 1972, Wayne Clawson became manager of the farm. He had come to Oregon from California where he had a criminal record of several convictions, with the result that he had assumed the name of Bill Wolf. From June 1972, until her death on November 23, 1973, Mrs. Weir and Wolf occupied the old two-story house on the farm.

Mrs. Weir was then 77 years of age and in poor health suffering from diabetes, high blood pressure, chronic urinary infection, diarrhea and progressive cataracts; but she was mentally "sharp" and strong willed, according to the testimony. Shortly after Wolf came to the farm Mrs. Weir fell and broke her hip. She was a heavy woman and thus had to be helped. As a result of these disabilities, Mr. Wolf helped her take her baths and helped her to bed, among other

things. He took good care of her, according to the testimony.

Shortly after he became manager of the farm Mr. Wolf had an attorney prepare a "management agreement," which he took to the farm, where it was signed by him and Mrs. Weir. By the terms of that agreement Mr. Wolf was to be the manager of the farm for five years, with "full authority" to manage it "within [his] sole discretion." The agreement also provided that as compensation he was to be furnished living quarters, rent free, for the five-year period, as well as title to all timber on the premises, to be removed within five years. There was no testimony as to the amount or value of that timber.

Mrs. Carlton, Mrs. Weir's daughter, became concerned about developing problems between herself and Mr. Wolf when she visited her mother on the farm. Although there is no evidence that she knew of the management agreement, she took her mother to the office of the attorney who had prepared her previous will. That attorney testified that he talked to Mrs. Weir alone and that she told him that she wanted to stay on the ranch and have Mr. Wolf take care of her, but that she did not want him to be in a "position to lay claim to the ranch as a result of services provided for her." She said nothing, however, about the written management agreement.

He then wrote a letter to Mr. Wolf as attorney for Mrs. Weir stating his understanding that "in return for taking care of Mrs. Weir and her ranch operation," Mr. Wolf was to receive "full tenancy at the premises," subject to termination at any time, and stating that if this was not a correct statement of the agreement between him and Mrs. Weir, to "contact me at your early convenience to discuss what you feel to be the true and correct nature of the agreement."

Mr. Wolf did not respond to that letter because, as he testified, he thought it "not important enough."

Considerable testimony was offered from several witnesses to the effect that as of that time Mrs. Weir did not want to sell the farm, which had been "in the family" for over 100 years, but wanted to keep it in "the family" for "the kids," in accordance with the provisions of her previous will leaving it to her daughter and that she made such statements as late as within three months prior to her death. Mr. Wolf, however, testified that she never told him that she wanted to keep the farm in the family, but said that "they would never take care of it," but would sell it and were "just waiting for her to die."

There was testimony that in "conversations" with Mrs. Weir, Mr. Wolf was critical of Mrs. Carlton for failing to devote sufficient attention to her mother; that this was the subject of "frequent conversations," and that Mrs. Weir was also critical of her daughter. Mrs. Carlton apparently visited her mother once each week "for the eggs" and also drove her to see the doctor. There were also difficulties between Mr. Wolf and one of Mrs. Carlton's sons, who was accused by Wolf of stealing from Mrs. Weir.

It also appears that a friend of Mr. Wolf, a Mr. Ogden, also originally from California, where he had once been convicted of a crime, was a frequent visitor at the farm. He stayed there on his days off from work "almost every week," and played cribbage and pinochle with Mrs. Weir. Another frequent visitor to the farm was Eldred Clawson, father of Mr. Wolf, who was retired and "came up" from California to visit his son. He also had a criminal record in California. According to Mr. Ogden, he, Mr. Wolf and Wolf's father, Mr. Clawson, were all "living" at the farm in November 1973 when the contested will was executed and when Mrs. Weir died.

Except for the testimony of one other witness, the only evidence of any statements by Mrs. Weir prior to the preparation and execution of the contested will indicating a change of her previous desire to leave the farm "in the family" was the testimony of Mr. Wolf himself. He testified that over a period of "a couple of months" he and Mrs. Weir "talked over the possibility of [his] becoming the owner of the place" and that she "asked me if I would keep the place going if I owned it and I told her I would try my very best." Mr. Wolf also told his friend, Mr. Ogden, that he would "like to own something like this" and also told his father that Mrs. Weir said that there was a possibility that she would "will the place to him." He denied, however, that he had any conversations with her about preparing a will to accomplish that purpose.

There was also testimony that on occasion Mr. Wolf would give Mrs. Weir an affectionate pat or hug and refer to her as "Mom." He also testified that Mrs. Weir trusted him, had "much confidence" in him, and that she confided most of her problems to him.

Just when and under what circumstances she finally decided to change her previous will is not entirely clear, even under the testimony of the proponents of the contested will. Mr. Ogden testified that he typed the will on a typewriter that he had taken to the farm and that he got the information for the will from Mrs. Weir, who said she was "very unhappy" with her daughter; that this was the reason for changing her will, and that she "definitely wanted to make a new will and leave it to Mr. Wolf." He testified that he suggested that she go to a lawyer but that she asked him to "do it." He also said that he typed two or three drafts of the one-page will and that Mrs. Weir finally said that "it would do all right." Ogden also said that he got the description of the farm for the purposes of the will from tax statements that were

"on the table" and that he did not know if they were provided by Mr. Wolf.

Mr. Wolf's father, Mr. Clawson, who also had lived at the farm for some time before the contested will was executed, said that he heard no discussions between Mrs. Weir, Ogden and Wolf about the will and knew nothing about it other than that Ogden typed it "upstairs" and then brought it down to show her to read and make any necessary changes.

Mr. Wolf testified that he gave the tax statement to Ogden for the purpose of using in the will its description of the farm, but that he did so at the request of Mrs. Weir, and that he did not tell Ogden what to "say" in the will, but that Mrs. Weir did. He also testified that about one month before he had tried, "at her request," to get the attorney who prepared his management contract to come to the farm and prepare a will, but that the attorney refused to do so and suggested that Mrs. Weir come to his office. Wolf said that he also previously talked to another attorney, who declined to prepare the will and suggested that he go to another attorney. Mr. Wolf testified that Mrs. Weir did not want anyone to know about the new will and feared that if she went to the attorney who prepared her former will her daughter would find out about it and would "raise Hell." These were the reasons, according to Mr. Wolf, that she asked Ogden to "do it."

Apparently the will was typed by Ogden on Sunday, November 18, 1973. On the following day Mr. Wolf requested a notary public, whom he had previously known, to come to the farm to notarize the will. Upon arrival of the notary, and in the presence of Mr. Ogden and Mr. Clawson, Wolf's father, the will was signed by Mrs. Weir and was witnessed by them. According to the testimony, Mr. Wolf, the sole beneficiary of the will, was "in and out" of the room both when the will

was prepared and when it was signed and witnessed. According to the notary, Wolf spoke to Mrs. Weir at that time as "Mom" and asked if he could get her another cup of coffee.

The notary and the other witnesses, Ogden and Clawson, identified their signatures and that of Mrs. Weir, but were not asked the usual questions whether she appeared to have the necessary testimentary capacity and whether she appeared to be acting of her own free will. They testified, however, that the notary read the will to Mrs. Weir before she signed it. There was other testimony that because of cataracts she had considerable difficulty in reading.

On November 23, 1973, four days after the execution of the will on November 19, Mrs. Weir died in the farmhouse of an apparent heart attack. Mr. Wolf was alone with her at that time. At that time the natural heirs of Mrs. Weir, in addition to the daughter who had been named as the sole beneficiary in her previous will, included another daughter and several grandchildren.

■ In its decree denying the "petition to revoke probate" of the will of November 19, 1973, and in admitting that will to probate "in solemn form" the trial court made no findings of fact other than general findings that Mrs. Weir was competent and that "said will was not the result of undue influence."

*It was established by the evidence that the will was the product of undue influence.*

The Supreme Court of Oregon held in *In re Reddaway's Estate,* 214 Or 410, 419-20, 329 P2d 886 (1958), that:

> "Definitions of undue influence couched in terms of the testator's freedom of will are subject to criticism in that they invite us to think in terms of coercion and duress, when the emphasis should

be on the unfairness of the advantage which is reaped as the result of wrongful conduct. 'Undue influence does not negative consent by the donor. Equity acts because there is want of conscience on the part of the donee, not want of consent on the part of the donor.' 3 Modern L Rev 97, 100 (1939). Said in another way, undue influence has a closer kinship to fraud than to duress. It has been characterized as 'a species of fraud.'

"* * * This court has held that where a confidential relation exists between a testator and the beneficiary, slight evidence is sufficient to establish undue influence. *In re Estate of Elise Rosenberg,* 196 Or 219, 246 P2d 858. The rule is more specifically stated in *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572 (1946), as follows:

> " 'The existence of a confidential relationship * * * when taken in conection with other suspicious circumstances may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference. * * *'

"It will be noted that the burden does not exist unless there are circumstances in addition to the confidential relation. * * *"

As in *Reddaway,* we find that there was a confidential relationship between Mrs. Weir and Mr. Wolf and that the "relationship [was] such as to indicate a position of dominance by the one in whom confidence [was] reposed over the other." As in *Reddaway,* we also find that in this case "suspicious circumstances are abundant."

In *Reddaway* the Oregon Supreme Court listed and discussed the various "factors of importance" to be considered in determining whether undue influence was exercised. Upon considering those various factors we find that enough of them were sufficiently estab-

lished so as to require the conclusion that the will of Sophia Weir was the product of undue influence by Bill Wolf, for reasons which we shall next discuss.①

(1) *Procurement, i.e., "participation of the beneficiary in the preparation of the will."* Wolf provided for Ogden the description of the farm for the purposes of the will, despite his contention that he did so at the request of Mrs. Weir. Aside from the fact that Wolf's friend Ogden typed the will and Wolf's own father and his friend Ogden witnessed the will, he also procured a notary public to witness the will and was "in and out" of the room during its execution, at which time he called Mrs. Weir "Mom" and offered to get her a cup of coffee.

(2) *Independent advice.* No independent advice was provided to Mrs. Weir relative to the preparation of the will.②

(3) *Secrecy and haste.* One reason that no lawyer was engaged to prepare the will was the desire to keep it a secret. The circumstances are such as also to indicate considerable haste in its preparation. The only reason for waiting until the next day for the execution of the will was the mistaken belief of Wolf that it had to be witnessed by a notary public.

(4) *Change in decedent's attitude toward others.* As in *Reddaway,* there was a change in the attitude of

---

① We recognize that since the Oregon Supreme Court decision in In re Reddaway's Estate, 214 Or 410, 329 P2d 886 (1958), that court has decided other cases involving the issue of undue influence. It appears, however, that the analysis of this subject in *Reddaway* is still the established law in this state. See also Grattan v. Bayley, 271 Or 616, 533 P2d 349 (1975); Wilson v. Martin, 266 Or 575, 514 P2d 341 (1973); and Geiger v. Palmer, 249 Or 123, 437 P2d 750 (1968).

② We have not overlooked the decision by the Oregon Supreme Court in Atkeson v. Holly, 258 Or 276, 280-82, 482 P2d 737 (1971), but find the facts of that case to be different from those of this case in which, among other things, there is considerable evidence of "secrecy and haste," a factor not present in that case.

the testator toward her own child. Although Wolf testified that the reason for the change was her displeasure with her daughter, it is "just as probable" in this case that Wolf "played a part in effecting this change in attitude," as it was that similar conduct played a similar part in *Reddaway.*

(5) *Change in the testator's plan of disposing of her property.* As in *Reddaway,* there was such a change in the plan of the testator and there was evidence of a previously "settled intent in the disposition of [her] estate" and of a "variance" between the testator's previous will and the will in question.

(6) *Unnatural or unjust gift.* Although, as recognized in *Reddaway,* one may make a legal disposition of his estate which reasonable men would regard as "unfair," it is a "circumstance" to be weighed in determining whether undue influence existed. This is not a case in which the beneficiary who cared for an ill and aged testator was rewarded by the will for faithful service and would otherwise have received little or no compensation. Wolf already had procured a five year "management agreement," including title to all timber on the property.

(7) *Susceptibility to influence.* Finally, as in *Reddaway,* this testator, although a person of "strong will," was physically sick and infirm and was susceptible to influence by reason of her dependence upon Wolf as the result of her physical infirmities.

As in *Reddaway,* there was also other evidence in the record which was relevant to the issue of undue influence, including other "suspicious circumstances," but the combination of the foregoing circumstances is sufficient, in our judgment, to require that this court sustain the contention of the contestants that undue influence was exercised upon this testator.

■ We recognize that in *Reddaway* the trial court

had made a finding of undue influence and that the Oregon Supreme Court, in affirming the trial court, recognized the weight to be given to its findings. Nevertheless, this court has the responsibility to hear appeals in such cases de novo and to make its own determination on questions of fact. Although we recognize the weight to ordinarily be accorded to the contrary findings by the trial court, we nevertheless conclude, after a careful review of the record, including all of the various "circumstances" previously discussed that the will of Sophia Weir was the product of undue influence by Bill Wolf.

Accordingly, the decree of the trial court is reversed and this case is remanded for further proceedings not inconsistent with this opinion.