Argued January 22, affirmed March 8, reconsideration denied April 14, petition for review denied April 27, 1976

In re Ante Covich's Will:
COVIC et at, *Appellants,*
*v.*
ROSO et al, *Respondents.*
(No. 120 673, CA 4518)

546 P2d 773

*Marvin S. Nepom,* Portland, argued the cause and filed the briefs for appellants.

*Miles Sweeney,* Portland, argued the cause for

respondents. With him on the brief was David J. Sweeney, Portland.

Before Schwab, Chief Judge, and Foley and Thornton, Judges.

FOLEY, J.

**FOLEY, J.**

In this will contest the circuit court found that the testator had testamentary capacity and that the will was not the product of undue influence. Contestants appeal and we affirm.

Testator Ante "Tony" Covich was 82 years of age at the date of his death, April 17, 1974. He was a bachelor. He came to the United States about 1913, worked in a logging camp, then in a combination poolroom and fruitstand, and later a restaurant, until 1961. By 1964 he had acquired a house, an apartment house and a four-plex as principal assets. In addition, he accumulated some other assets in bank accounts, bonds and life insurance.

The principal beneficiaries of the will were John and Mary Roso, who received the house, the apartment and four-plex, together with contents. The will also gave bequests of $1,000 each to three other friends and to a brother in Argentina and a sister in Yugoslavia and $2,000 to a nephew (son of a deceased brother) in Yugoslavia. The residuary legatee was a brother in Yugoslavia.

John and Mary Roso were closely associated with testator during his life in the United States. John believed they were fourth cousins. When testator first arrived in Portland he met Mary Roso's father, a countryman from Yugoslavia. The association continued and in April 1932, John and Mary Roso were married. Testator, pursuant to a Yugoslavian custom, was best man for Mary Roso. After their marriage the Rosos lived with the testator in his home for eight months. They then moved next door to the Evelyn Apartments which were later owned by testator and they lived there and managed the apartments for testator for 17 years in return for their rent. The home where the Rosos originally resided with testator and the Evelyn Apartments constituted the bulk of the real property left to John and Mary Roso, together with the other

parcel of property, the four-plex, which the Rosos managed and maintained for testator for 20 years.

There was evidence that testator was fond of the Roso family. Prior to 1956 testator took out his only life insurance policy, naming John Roso as beneficiary. He bought savings bonds for the Rosos' only son, John, Jr., in 1942, and years following, and purchased a $1,000 bond for the boy in the 1950's. He gave John, Jr., a wedding present of $500 and subsequently gave the couple funds to purchase appliances for their new home.

In July of 1952 testator opened a savings account for the Rosos' daughter, Rosemary, intermittently adding to the account until his death, at which time the account totalled $5,213.36. Upon Rosemary's marriage he gave the couple $400 as a wedding present and frequently gave gifts to John and Mary Roso's grandchildren. He also gave gifts to the Roso family on appropriate occasions.

In 1972 testator's physical condition required his entry into a nursing home and in January 1973 a conservatorship was established with Mary Roso as conservator. It was originally intended that the conservatorship would be for only a short time but his physical condition did not improve and after several months he was resigned to never leaving the nursing home.

In the latter part of 1973 testator requested to see his attorney about making a will and he asked Mary Roso to call Mr. Gooding. Bert S. Gooding, his attorney, had been acquainted with testator since the early 1930's and after the request, Gooding had the Rosos drive him to the nursing home and with the Rosos present he talked with testator about the will. Mr. Gooding testified that he visited the testator at the nursing home probably a half-dozen times to discuss the proposed will. He testified that this was over a period of three or four months. After a visit to testator when Gooding had several drafts of will which he went over with testator, Gooding had his secretary prepare

the final draft which she made from written notations made on one of the drafts of will and from dictation by Mr. Gooding.

On February 27, 1974, Mr. Gooding requested Fred B. Duffy, a lawyer who was an office associate, to accompany him to Bess Kaiser Hospital, where testator had been transferred from the nursing home, and he asked Mary and John Roso to drive them there. At the hospital Mr. Gooding read the will to testator, paragraph by paragraph, and after each paragraph he asked testator whether that was what he wished. The testator would nod his head in an affirmative motion after such inquiry and when Mr. Gooding reached paragraph nine, testator shook his head "no." Paragraph nine contained a devise of $1,000 to his nephew Branko. Testator said "No, two" and put up two fingers to indicate two. The figure was then changed to $2,000, and initialed. Testator was physically weak and when attorney Duffy noticed that he was having trouble with the pen, he asked if he could help and testator nodded in the affirmative. Duffy then proceeded to assist testator in making his signature.

After undergoing a gastrostomy (surgical entry into the stomach through the abdominal wall for the introduction of food) on March 2, 1974, testator was returned to the nursing home on March 20, 1974. On April 17, 1974, his condition worsened and he was returned to Bess Kaiser Hospital, where he died on that date.

■ We turn now to the question of the testamentary capacity of the testator. Medical testimony was introduced by the contestants which cast doubt upon the mental capacity of the testator at the time of the execution of the will. This was countered by the testimony of nurses who, combined, saw him more than 20 times per day and by testimony of visiting friends who knew testator well, most of which testimony tended to support mental capacity. Mental competency to execute a will is determined as of the time the will

was signed. *Whitteberry v. Whitteberry,* 9 Or App 154, 496 P2d 240 (1972). For this reason the testimony of the subscribing witnesses to the will is entitled to great weight. Our Supreme Court in *In re Will of Robert Carr,* 121 Or 574, 256 P 390 (1927), stated:

> "In determining the mental capacity of the testator at the time of making the will great weight is to be given to the testimony of the subscribing witnesses. They have the opportunity to observe the mental condition and all the surrounding circumstances at the time of the execution of the will * * *." 121 Or at 580-81.

In this case, both subscribing witnesses to the will, attorneys Bert Gooding and Fred Duffy, testified that in their opinion the testator was competent. They pointed out some of the bases for their conclusion that the testator was mentally competent. One was the act of the testator in indicating that one devise should be raised from $1,000 to $2,000. After the change had been made, Gooding, the scrivener, asked the testator if this was rewritten according to his wishes, to which he nodded "yes." The contestants' principal medical witness, Dr. Gloekler, examined testator five days prior to the execution of the will and did not witness the execution of the will. He thought testator was suffering from senile dementia. Although Dr. Gloekler related testator's senile dementia to be the same the five days later, we conclude, in accordance with the rule of law set forth above, that the testimony of attorneys Duffy and Gooding should be accorded greater probative value.

Mr. Duffy gave as his opinion that at the time testator signed his will he clearly knew what he was doing and was able to transact business; was able to comprehend the nature of the act he was engaged in; was aware of the nature and extent of his properties; was able to appreciate the persons who should or might be the natural objects of his bounty; was aware of the scope and reach of the provisions of the will and was of sound mind.

At the time of trial Mr. Gooding had suffered a

series of strokes, was confined to a nursing home and was unable to testify. Prior to this misfortune, a discovery deposition had been taken by contestants and Mr. Gooding was asked his opinion of the testator's mental and physical condition prior to February of 1974, while he was still in the nursing home, and Mr. Gooding stated:

> "Natural, alert person. He enjoyed company, not too responsive. He was the quiet type, I would say. But he was — he knew what he was doing."

The contestants' attorney then questioned Mr. Gooding concerning his observation of the testator on one or two visits he made to the hospital between the February 9th admission and the February 27th will and was advised by Mr. Gooding as follows:

> "No change, I would say; his physical well-being and everything would be — he was a hardy person, no change."

Contestants' attorney asked Mr. Gooding if on February 27th he noted any difference, physical or mental, in testator as distinguished from his other hospital visits. Mr. Gooding responded:

> "Except that he was awfully weaker."

Our review of the record convinces us that at the time of the execution of the will the testator possessed mental competency.

■ We turn now to contestants' claim of undue influence. *In re Reddaway's Estate,* 214 Or 410, 419, 329 P2d 886 (1958), is cited by contestants as setting forth the various factors of importance to be considered in determining whether a will is the product of undue influence. These factors are (1) procurement (participation of the beneficiary in the execution of the will), (2) independent and disinterested advice from third parties, (3) secrecy and haste in making the will, (4) unexplained change in testator's attitude toward others, (5) change in testator's plan of disposing of his property, and (6) the making of an unnatural or unjust gift.

Referring briefly to each of the factors mentioned above, there is no evidence whatever of procurement. As to independent advice, the attorney Gooding dealt with the testator and testified that he, Gooding, did not discuss the contents of the will with the Rosos, although they were at the hospital at the time the will was executed. Nor is there any evidence whatever of secrecy and haste. Attorney Gooding testified that he spent about three or four months in the preliminaries and ultimate execution of the will. We are unable to infer from the testimony a change in the testator's plan of disposing of his property and we do not consider the gift to the Rosos to be unnatural or unjust. Testator remembered each of his brothers and his sister in his will; he had not seen them since he left Yugoslavia over 60 years previously, and had never seen his nephews in Yugoslavia. From the long and close association of the Rosos to the testator, it would seem that they were the natural objects of his bounty. Our Supreme Court said in *In re Estate of Verd Hill,* 198 Or 307, 315, 256 P2d 735 (1953):

> "* * * [A] will is not unnatural because it excludes one's next of kin in preference to those who may have enjoyed a closer and perhaps an affectionate relationship with the testator. * * *"

With reference to the donor's susceptibility to influence, the burden is always upon the contestant to prove undue influence. In this case we find no substantial evidence that the Rosos exercised any undue influence.

> "* * * [A] court cannot 'accept in lieu of substantial evidence mere suspicion, inuendo, insinuation, and speculation.' * * *" *Cline v. Larson,* 234 Or 384, 410, 383 P2d 74 (1963).

Hence, it is our conclusion that the contestants have failed to prove undue influence in this case.

Our review convinces us that testator's will was duly and properly executed with testamentary capac-

ity and without undue influence and that the decree of the court admitting the will to probate in solemn form should be affirmed.

Affirmed.