Argued February 17, affirmed March 29, 1976

In the Matter of the Estate of Edgar A. Johnson,
Deceased.

SPENCER, *Appellant,*

*v.*

HAMIT, *Respondent.*

(No. 12687, CA 4821)

547 P2d 658

*F. P. Stager,* Salem, argued the cause and filed the briefs for appellant.

*Robert T. Scott,* Albany, argued the cause for respondent. With him on the brief were Scott and Norman, Albany.

Before Schwab, Chief Judge, and Langtry and Thornton, Judges.

LANGTRY, J.

**LANGTRY, J.**

Petitioner appeals from a decree admitting to probate the will of her deceased brother Edgar Johnson. Petitioner contests the will on the grounds that proponent—nominated therein as personal representative and designated as principal beneficiary—"unduly influenced" decedent in its preparation and execution and because at the time of its execution—December 20, 1974—decedent was without testamentary capacity.

Decedent was approximately 87 years of age at the time of his death on January 24, 1975. His first will was executed in February of 1972, naming his two children as nominal beneficiaries, leaving the bulk of his estate to petitioner, and nominating proponent as personal representative. It is conceded that decedent was of "sound mind"[1] in 1972. The record indicates that decedent's behavior throughout his later years was marked by an eccentricity and irascibility not uncommon to those of an advanced age. Petitioner takes the position, however, that following a stroke decedent suffered in December 1974 his ability to know the nature and extent of his property, the natural objects of his bounty, and the significance of executing a will had diminished to the point that he was no longer legally competent.[2]

Following his stroke decedent was hospitalized in

---

[1] "Any person who is 18 years of age or older or who has been lawfully married, and who is of sound mind, may make a will." ORS 112.225.

[2] "The requirements of sound-mindedness or mental competency, as used in ORS 114.020, have been freequently stated by this court and may be summarized as follows: (1) the person must be able to understand the nature of the act in which he is engaged; (2) know the nature and extent of his property; (3) know, without prompting, the claims, if any, of those who are, should or might be, the natural objects of his bounty; and (4) be cognizant of the scope and reach of the provisions of the document. If the foregoing conditions are found to prevail at the time of executing the instrument, the testator is deemed to have sufficient capacity to make a will. *Re Phillips' Will,* 107 Or 612, 618, 213 P 627 (1923); *In Re Walther's Estate,* 177 Or 382, 386, 163 P2d 285 (1945); *In Re Estate of Verd Hill,* 198 Or 307, 317, 256 P2d 735 (1953)." *Kastner v. Husband,* 231 Or 133, 136, 372 P2d 520 (1962).

Stayton and Salem on two occasions during the first part of December. When at home, he was cared for by friends and housekeepers. While hospitalized in Salem on December 9, decedent apparently expressed an interest in modifying his will; a Salem attorney was contacted by a friend of decedent and asked to come to the hospital for the purpose of effecting the change. Nothing was done, however, because the attorney responding to the call concluded, based upon an attempt to converse with decedent which lasted some five minutes, that decedent was without the mental capacity to take such action. Decedent returned home December 10 where responsibility for his care was assumed by a friend, Sandra Mann. One week later, on December 17, decedent appeared in the office of Richard Triska, an Albany lawyer, accompanied by Ms. Mann. Decedent indicated to Mr. Triska that he had been referred by a mutual friend and wished to execute a new will naming Ms. Mann as principal beneficiary in return for her promise to take care of him for the rest of his life.[3] A will designating Ms. Mann as residual beneficiary was executed, and the 1972 will destroyed, on that date. Based upon his experiences in other cases where testamentary dispositions had favored unrelated individuals over surviving relatives, Mr. Triska decided it would be best to secure a medical opinion concerning decedent's mental capacity in order to confirm his own favorable impression. For that reason he called a local doctor and arranged for an interview and examination that same afternoon. Following that examination, which lasted some 15 to 20 minutes and was focused specifically on evaluating decedent's capacity to understand his present situation and to think analytically, Dr. Benjamin Bonnlander, a physician with considerable experience in the field of geriatrics, concluded that decedent

---

[3] Ms. Mann understood that the change in decedent's will was a consequence of her promise to provide for decedent and to ensure that "he would not ever die in a nursing home * * *." The record indicates decedent had strong feelings about avoiding nursing homes.

was of "sound mind and [in] satisfactory control of his mental faculties."

Because he had failed to have decedent initial the separate pages of the will executed on the 17th, Mr. Triska subsequently requested him to return to his office for that purpose. Accompanied by proponent decedent returned on December 20, 1974 and informed Mr. Triska that because Ms. Mann had violated the terms of their agreement he wished to write a new will making proponent the principal beneficiary of his estate. Proponent testified that he had been friends with decedent since 1966, that proponent often performed odd jobs for decedent at his request and that on December 20 decedent had called and asked to be driven to Mr. Triska's office. He also testified that he only learned that a new will naming him as principal beneficiary was to be written after their arrival at Mr. Triska's office. The testimony is unrebutted by any other evidence.

The will challenged here by petitioner was drafted by Mr. Triska, executed, and witnessed by a second attorney and his secretary on December 20. The attesting witnesses both testified that they signed the document in decedent's presence after ascertaining to their satisfaction that decedent understood (1) what property he owned, (2) that the will provided for the disposition of that property, and (3) to whom he was leaving his estate. Both witnesses were of the opinion that the decedent was rational and of sound mind at the time the will was executed. Concerning his observations on both December 17 and 20, Mr. Triska testified as follows:

"A  * * *  [A]s I indicated before when he spoke about the raising the price of the marker for his grave, he was well aware of the situation of inflation. He talked about he had several interests which were primary on his mind that he talked about and one was his health. He wanted to obtain physical therapy so he could regain the use, the functions of his body. He talked about his need for a housekeeper and his reason for wanting Miss Mann

[ 901 ]

for assistance and when he felt she was not giving the assistance — all of the conversations that I had with him seemed to indicate a man who was physically disabled, but certainly knew what he was doing and what he wanted to do. He impressed me as a man with a strong mind.

"Q [Proponent's counsel:] Based on your observations and discussions with [decedent] on the 17th and 20th of December, 1974, did you form an opinion as to whether he knew what his property was?

"A There is no doubt in my mind. He knew.

"Q Did he know who his relatives were at that time?

"A Definitely — and in fact, just on that point, because I didn't know in the 1972 will, they were not listed as son, daughter or whatever and so I had to ask him because I believed it should be spelled out as my son so and so and I asked who is so and so and he indicated my daughter, Aloha and my son, Floyd and my sister Ada Spencer.

"Q And did he indicate to you that he understood the nature of what he was doing?

"A Yes. In fact, of course, he initiated it by coming in expressly twice indicating he wanted a will to be made out.

"Q Did you form an opinion as to his mental soundness on that particular date, on the 20th of December, 1974?

"A Yes. He was of sound mind on that date."

On the afternoon of December 20 decedent was also taken by the proponent to see Dr. Thomas VanVeen, a Stayton physician who had been treating decedent regularly for a period of some six months. Dr. Van-Veen testified that in his opinion the decedent did not, between the 17th and 20th of December, "really understand" the nature of his wealth or the natural objects of his bounty. This opinion was based upon general symptoms of "confusion * * * repetition, going off into certain tirades against people, having inappropriate distrust toward people and a very distinct loss of memory for recent events." Dr. VanVeen acknowledged, however, that while he had observed those symptoms on several occasions, there had also been occasions

when decedent would appear to be rational and to know what he was doing; in response to questioning by petitioner's attorney Dr. VanVeen indicated that:

"* * * [A]t times [decedent] would be what you might say 'with it'. He would seem to comprehend a little bit more quickly what you were saying but one would still have to be repetitious. At other times he seemed not to understand at all what you were saying. I think it was a matter of degree."

Dr. VanVeen was not asked and volunteered no opinion specifically as to the state of decedent's mental condition when examined on December 20.[4]

Mr. Sam Fratto, a friend of decedent's since 1970, saw decedent on a weekly basis between June and December of 1974, and spent the entire weekend of December 21-22 at decedent's home. Mr. Fratto testified that throughout this 48-hour period decedent exhibited behavior not unlike that he had commonly displayed prior to his stroke,[5] and that decedent appeared to have no substantial difficulty either in understanding what was said to him or in communicating his own thoughts. In Mr. Fratto's opinion decedent was, although physically disabled, as capable of "taking care of his own affairs and understanding what was going on * * *" in December of 1974 as he had been in 1970.

As one contesting the validity of a will on the ground of "undue influence," petitioner has the burden of establishing that the decedent was induced "to

---

[4] Dr. Charles Campbell, a Salem physician who had treated the decedent over a period of 25 years and who had referred decedent to Dr. Van-Veen, also testified in effect that "most of that time" after the first of December decedent lacked the mental capacity to effectively write a will. Because he had not seen decedent after December 10, 1974 when he was released from the Salem hospital, however, Dr. Campbell could not offer an opinion as to his mental condition on the day the will was executed.

[5] "* * * [Decedent] was very able to talk, he did alot of rambling and alot of repetition, but that was not new because he was very repetitious in 1970 and I heard the same stories seven times very often. The only changes that I saw he was slower and he wasn't able to — he could dress himself if you helped a little and he could undress if you helped a little. His ability to converse was very good."

[ 903 ]

execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person * * *." *In re Estate of Porter,* 192 Or 483, 492, 235 P2d 894 (1951).[6] Considering the circumstances surrounding the execution of decedent's will in light of the "factors of importance" to be used in determining whether a will is the product of undue influence,[7] we find that petitioner has failed to meet her burden. There is no evidence that proponent played any part in the preparation or execution of the will other than driving decedent to Mr. Triska's office. Mr. Triska even testified to proponent's remaining in a waiting room while the will was being executed. We find no evidence showing dominance or insidious conduct by proponent in this record. *See In re Darst's Will,* 34 Or 58, 54 P 947 (1898); *Sheppard v. Kartes,* 19

[6]The existence of a confidential or fiduciary relationship between a testator and a beneficiary charged with undue influence, together with other "suspicious circumstances" surrounding the execution of the will, may give rise to a presumption of improper influence so as to require the proponent to go forward with the proof and present evidence sufficient to overcome the adverse inference. *See In re Reddaway's Estate,* 214 Or 410, 329 P2d 886 (1958); *Carlton v. Wolf,* 21 Or App 476, 535 P2d 119 (1975). The record in this case does not, however, demonstrate that the relationship between decedent and proponent was such " '* * * as to indicate a position of dominance by the one in whom confidence [was] reposed * * *.' " (Brackets theirs.) *Carlton v. Wolf,* supra, 21 Or App at 483. Although proponent visited with his friend often and assisted him in his affairs, there is no evidence that decedent ever asked for or received any business advice from him. Neither is there any evidence that proponent ever made any suggestion as to the disposition of decedent's estate. Proponent's *nomination* as personal representative in the will does not constitute conclusive evidence of a confidential or fiduciary relationship *prior to decedent's demise.* ORS 114.265 provides only that a personal representative is a fiduciary who has the duty of collecting income, preserving, settling and distributing the estate. These are duties and relationships that arise after testator's decease.

[7]"* * * *In re Reddaway's Estate,* 214 Or 410, 419, 329 P2d 886 (1958), is cited by contestants as setting forth the various factors of importance to be considered in determining whether a will is the product of undue influence. These factors are (1) procurement (participation of the beneficiary in the execution of the will), (2) independent and disinterested advice from third parties, (3) secrecy and haste in making the will, (4) unexplained change in testator's attitude toward others, (5) change in testator's plan of disposing of his property, and (6) the making of an unnatural or unjust gift." *Covic v. Roso,* 24 Or App 629, 635, 546 P2d 773 (1976).

Or App 567, 528 P2d 88 (1974); *Nease v. Wilson, Clark,* 6 Or App 589, 488 P2d 1396, Sup Ct *review denied* (1971); *Golden v. Stephan,* 5 Or App 547, 485 P2d 1108 (1971); *Nelson v. O'Connor,* 3 Or App 215, 473 P2d 161 (1970). *Compare Wilson v. Martin,* 266 Or 575, 514 P2d 341 (1973); *Geiger v. Palmer,* 249 Or 123, 437 P2d 750 (1968); *Carlton v. Wolf,* 21 Or App 476, 535 P2d 119 (1975).

Whether decedent was competent to execute a will on December 20, 1974 is a more difficult question. Some ten witnesses in addition to those referred to above testified to their observations and opinions relating to decedent's mental condition during the last months of his life. This testimony is inconclusive at best.

The final test is whether the decedent was competent *at the time the will was executed.*[8] Evidence of incapacitation prior or subsequent to the time of the will's execution is relevant but it lacks the probative value of evidence revealing his mental condition at the material time. Its value diminishes the more removed it is from the crucial date. Thus, the testimony of attesting witnesses and, next to them, of those present at the execution of the will is to be accorded "great weight" in cases of this kind.

Dr. VanVeen, who saw him as noted on December 20, was the only witness who saw decedent within three days of the execution of the will on December 20 offering the opinion that he lacked testamentary capacity. That opinion was neither specific as to the date December 20, nor otherwise entirely unequivocal. As the doctor conceded was the case, the decedent's condition was a somewhat fluctuating one which included intervals during which decedent might be

_____

[8] "* * * [A] will made by an insane person may be valid if made during a lucid interval. *In Re Faling Will,* 105 Or 365, 445-446, 208 P 715 (1922); *Snyder v. DeRemer,* 143 Or 414, 417, 22 P2d 877 (1933); *In Re Southman's Estate,* supra (178 Or at 480); 94 CJS 741, Wills § 36; 57 Am Jur 89, Wills § 77." *Kastner v. Husband,* 231 Or 133, 136, 372 P2d 520 (1962).

entirely rational and in control of his faculties. Mr. Triska, the attesting witnesses and proponent—each of whom observed the decedent at the time of the execution of the will—all testified without reservation that in their opinions decedent understood—at that time—the nature of the act he was taking, the extent of his property, who his relatives were and to whom he was leaving his estate. Like the circuit court we also find the testimony of Dr. Bonnlander and Mr. Fratto to have greater weight than that of the other witnesses, most of whose opinions were based upon contacts with the decedent more removed in time from the date the will was executed.

■ Although the proponent of a will has the burden of proving the testamentary capacity of the testator, a duly executed will gives rise to a presumption of competency. *Martin v. U. S. National Bank,* 1 Or App 260, 457 P2d 662 (1969), Sup Ct *review denied* (1970). That presumption has not been overcome in this case. *See Kastner v. Husband,* 231 Or 133, 372 P2d 520 (1962); *Clauder v. Morser,* 204 Or 378, 282 P2d 352 (1955); *Whitteberry v. Whitteberry,* 9 Or App 154, 496 P2d 240 (1972); *Nease v. Wilson, Clark,* supra; *Golden v. Stephan,* supra; *Vsetecka v. Novak,* 4 Or App 463, 478 P2d 655, Sup Ct *review denied* (1971).

■ We find that the will executed on December 20, 1974 reflected the decedent's own testamentary wishes and that he possessed the requisite testamentary capacity at the time of its execution.

Affirmed.